Kenisha Eronda BERRY, Appellant,

v.

The STATE of Texas.

No. AP–74,913.

Court of Criminal Appeals of Texas.

May 23, 2007.

Rehearing Denied Sept. 26, 2007.

850

Douglas M. Barlow, David W. Barlow, Beaumont, for Appellant.

Rodney D. Conerly, Assistant Criminal District Atty., Beaumont, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

JOHNSON, J., delivered the opinion of the Court in which PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted in February 2004, of capital murder. TEX. PENAL CODE § 19.03(a). Based on the jury's answers to the special issues set forth in Texas Code

of Criminal Procedure Article 37.071, §§ 2(b), (e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). We have reviewed appellant's nine points of error. We affirm the trial court's judgment, but reform the sentence to life imprisonment.

## STATEMENT OF FACTS

Appellant was indicted for the murder of an individual under six years of age. The evidence at trial showed that in the early morning hours of November 29, 1998, Roy Black discovered the victim's body while he and his wife, Ima, were looking for aluminum cans in a dumpster at an apartment complex in Beaumont, Texas. Roy found the deceased male infant inside a trash bag with duct tape over his mouth. His arms were secured across his chest with duct tape and there was fecal matter inside the trash bag. Ima alerted the police and named the infant "Baby Hope."

The case remained unsolved until the summer of 2003, when Debbie Beavers of the Jefferson County Sheriff's Department was investigating another case involving appellant. During the course of the investigation, appellant took Beavers to the dumpster where Baby Hope had been found. Beavers brought this to the attention of Beaumont police officer John Boles, who had appellant's fingerprints compared to those found on the duct tape and trash bag. A latent palm print on the trash bag matched appellant's right palm. A latent fingerprint on a piece of duct tape matched appellant's left index finger. DNA testing of the victim's blood and appellant's oral swabs indicated a 99.98% probability that appellant was the mother of the victim.

On June 27, 2003, Child Protective Services (CPS) worker Tracy Rideaux met with appellant, who was in jail on another charge. At that time, appellant had an infant daughter named Paris, who was in the care of CPS. She also had a nine-year-old daughter named Jasmine, a seven-year-old daughter named Keerstan, and a three-year-old son named Joskin. Rideaux testified that appellant's infant daughter was fathered by a man named Leonard Carrier and her three older children were fathered by a man named Joskin Love. At the first jail meeting, Rideaux and appellant discussed the removal of Jasmine, Keerstan, and Joskin, and the potential for a family placement. Rideaux met with appellant in jail again on July 10, 2003, after appellant had been charged with capital murder in the death of her son Malachi, known to authorities as Baby Hope. Rideaux asked appellant if her family knew anything about Malachi or other hidden pregnancies, because their knowledge would affect the placement of appellant's children. Appellant told Rideaux that "she knew how to hide a pregnancy" and her weight fluctuated a lot. She stated that "her family had absolutely nothing to do with Baby Hope or what was going on." She revealed that she gave birth to Malachi at home in her apartment, that it was an "easy delivery," and that he was "fine" when he was born. She went to the store and purchased a bottle and some formula after his birth. Her other children were with a relative at the time of his birth, and when the children returned home, she explained that "she was keeping a friend's baby." She did not give Rideaux any details about the duct tape other than acknowledging that she had duct tape "lying around the house." She did not confess that she killed Malachi, but stated that she

1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

borrowed her grandmother's car, placed the infant, "which was already inside the trash bag," in the trunk, and transported him to a dumpster without anyone's knowledge. She stated that "the baby was not kicking or moving" when she put him in the dumpster.

Appellant testified at trial that she did not kill her baby. She knew that she was pregnant in 1998, but she did not know how far along she was in her pregnancy. The father of the baby was a man named Nicholas Beard. She did not tell her family or anyone else about her pregnancy. She gave birth at home by herself and named the infant Malachi. He appeared to be healthy when he was born, and she fed him milk from a bottle. His nose started running the next day, and she went to the store that morning to buy milk. When she returned from the store, he was still asleep on the bed in her bedroom. She lay on the couch to watch television and later checked on him because she was concerned that he had not yet awakened. When she went into the bedroom, he was "limp" and was not moving or breathing. She realized that he was dead, but did not call for help because she was "scared" and did not know "if it was against the law to have a baby at home." She put duct tape over his arms because they were stiff and sticking out and she "wanted them in front of him." She put duct tape over his mouth because it bothered her that his mouth was open. She left her apartment with Malachi in a bag and later placed him in a dumpster.

The prosecutor questioned appellant on cross-examination regarding her infant daughter Paris. Appellant acknowledged that she hid her pregnancy with Paris, but avoided answering the prosecutor's questions about whether she had abandoned Paris on the side of a road.

Forensic pathologist Tommy Brown had performed the autopsy on Baby Hope and estimated that he was two to five days old. Duct tape had been used to cover his mouth and to constrain his arms around his abdomen, and he had been placed inside a plastic trash bag. His stomach contained a "milk-like product," which indicated that he had been fed before death, and there was fecal matter inside the plastic trash bag. He had "petechiae of the pleural surfaces of the lung," which was consistent with oxygen deprivation. The combination of being duct taped and covered with a plastic trash bag was also consistent with oxygen deprivation. Brown observed no indications of an infection or sudden-infant-death syndrome. He determined that the infant "died from asphyxia due to smothering," and he ruled the death a homicide. Brown opined that the infant was still alive when he was placed in the plastic trash bag, and "as the baby died, then there was a large release of fecal material from the rectum." The lividity on the anterior and posterior sides of the body led him to conclude that the infant was lying on his stomach when he died and that after he was discovered he was turned over and placed on his back for a short period of time.

Defense expert Stephen Pustilnik, a forensic pathologist, testified that he reviewed Brown's autopsy report and the photographs and microscopic slides that were taken at the autopsy. He observed "multiple areas of meconium[2] aspiration" in the microscopic slides of the victim's lungs, and he criticized Brown for failing to include an assessment of the microscopic slides in his autopsy report. He believed that the infant released meconium from his bowels while experiencing fetal distress prior to birth, which later caused

---

**2.** The meconium is the first fecal excretion of a newborn child.

"a significant pneumonia enough to explain this child being very sick and sick enough to die." He also observed petechiae on the surface of the infant's lungs, but stated this was a "nonspecific finding" that "should never be used as proof of anything." He testified that the duct tape on the infant's mouth would not necessarily cause asphyxia because most babies are "obliga[te] nose breathers." However, he acknowledged that the plastic trash bag could have caused asphyxia. He did not think that the fecal matter inside the plastic trash bag was indicative of the time of death because defecation could have occurred either at or after the time of death, nor did he think that the infant was struggling in the bag when the fecal matter was released from his rectum because the feces was confined to his buttocks, lower back, and "the back of the foot that was resting in it because the knee was flexed up and the foot was in the feces." He disputed that the lividity on the body necessarily indicated that the infant died on its stomach because "[t]here are always exceptions to this rule." Pustilnik could not specifically conclude what caused the death of the infant. He acknowledged the possibility of homicide and asphyxia, but testified that the "child could have died naturally prior to being placed in the bag with the tape on it." He had "two good guesses" as to why the infant died: "One is natural, one is homicide." He testified that "it's just as likely that this child died of a natural cause as it is that it died of a homicide."

Defense expert Carl Hunt, a medical doctor specializing in pediatrics and neonatology, testified that he reviewed the autopsy report and accompanying photographs. He testified that the duct tape on the victim's mouth "would not be suffocating to this infant" because "young infants prefer to breathe through their noses." He believed that the fecal material inside the plastic trash bag was insignificant because "the release of fecal material could have occurred at any time." He agreed that petechiae on the infant's lungs could have developed due to oxygen deprivation, but stated that petechiae are "not proof of any particular mode of death" and are "very common in autopsies of young infants who die in unexplained situations." Hunt "could not reach a conclusion as to how or why this baby died" until he spoke to Pustilnik, who informed him that he had discovered the presence of meconium in the microscopic slides of the infant's lungs. After Pustilnik told him this, Hunt concluded that "this infant died of natural causes related to birth asphyxia and meconium aspiration syndrome, in other words, lung failure."

The state recalled Brown after the testimony of Pustilnik and Hunt. Brown disagreed with Pustilnik's findings of pneumonia or infection. He testified that he specifically looked at the victim's lungs during the autopsy.

> Whenever I looked at the lungs, the alveolar spaces were open. There were a few squamous cells, which comes from the amniotic fluid within the alveolar spaces. There was meconium that was described earlier. It has a yellow brown pigment effect. So, I did not realize there was any of that within the lungs. A pneumonia—you have to have neutrophils, which are white blue cells for bacterial infection or you have lymphocytes, which indicates a viral infection. The baby had neither of those. I cannot call this a pneumonia.

Brown continued to believe that the cause of death was "asphyxia due to smothering and a homicide."

## SUFFICIENCY OF THE EVIDENCE AT GUILT/INNOCENCE

In point of error one, appellant alleges that the evidence is factually insuf-

ficient to support her conviction for capital murder. Evidence may be factually insufficient if: "1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and preponderance of the available evidence." *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). In *Watson v. State,* 204 S.W.3d 404, 414–15 (Tex.Crim.App. 2006), we recently reiterated that the evidence, though legally sufficient, is factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. Such a factual sufficiency review requires the reviewing court to consider all of the evidence. *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Sells v. State,* 121 S.W.3d 748, 754 (Tex.Crim.App.2003); *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

Appellant argues that "the overwhelming evidence presented at the trial indicated that the child died of natural causes rather than a homicide," pointing to the testimony of defense experts Pustilnik and Hart. Pustilnik, however, could not pinpoint the cause of the victim's death. He acknowledged the possibility of homicide and asphyxia, but testified that the infant could have died from pneumonia following meconium aspiration. He ultimately concluded that "it's just as likely that this child died of a natural cause as it is that it died of a homicide." Hunt initially could not determine the cause of death based on his own review of the autopsy report and photographs. He was able to reach a conclusion only after talking to Pustilnik and

hearing his description of the microscopic slides.

Appellant attacks Brown's conclusion, based on the presence of fecal matter, that the infant was alive when placed inside the plastic trash bag. Pustilnik and Hunt disagreed with Brown's conclusion, but acknowledged the possibility that defecation could have occurred at the time of death. Appellant argues that the infant could not have been smothered by the duct tape on his mouth because Pustilnik and Hunt testified that most infants are obligate nose breathers. Pustilnik, however, acknowledged that the plastic trash bag could have caused asphyxia.

Brown's conclusion that the infant did not have pneumonia was supported by other evidence at trial. On voir dire examination by the state, Pustilnik testified that "a child with this much pneumonia" could be "irritable," "hard to take care of," and "whiny." However, appellant told Rideaux that the infant was "fine" when he was born. She also testified at trial that he appeared to be healthy at birth, and she described no symptoms of illness other than a runny nose.

The experts' disagreement regarding the cause of death does not make the evidence insufficient in this case. The evidence supporting the verdict was not so weak as to be clearly wrong and manifestly unjust, nor was the adverse finding against the great weight and preponderance of the available evidence See *Marshall,* 210 S.W.3d at 625–26; *Watson,* 204 S.W.3d at 414–15. Point of error one is overruled.

TESTIMONY OF CPS WORKER

■ In point of error two, appellant argues that the trial court erroneously admitted the testimony of CPS worker Tracy Rideaux regarding statements appellant made to her in jail. Appellant complains

that she received none of her statutory or constitutionally required warnings before making her oral statements to Rideaux. Appellant contends that Rideaux was a state agent and was thus required to warn her in compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Article 38.22.[3]

The procedural safeguards of *Miranda* apply to custodial interrogation by law enforcement officers or their agents. *Wilkerson v. State,* 173 S.W.3d 521, 527 (Tex.Crim.App.2005). State employment does not, by itself, make a person an agent of the state for the purpose of defining "custodial interrogation." *Id.* at 528. Different types of state employees serve different roles. *Id.* It is law enforcement's job to ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible prosecution. *Id.* CPS workers have a different duty: to protect the welfare and safety of children in the community. *Id.* Police officers and CPS workers generally run on separate, parallel paths. *Id.* at 529.

> While police are collecting information for an arrest and criminal prosecution, CPS workers are investigating to find safe housing and protection for abused or neglected children. When a state-agency employee is working on a path parallel to, yet separate from, the police, *Miranda* warnings are not required.
>
> On the other hand, if the once-parallel paths of CPS and the police converge, and police and state agent are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be necessary.

*Id.* Courts must examine the entire record to determine if the paths of CPS and the police are parallel or if they have converged in a particular case. *Id.* at 530. Central to this evaluation are the actions and perceptions of the police, the CPS worker, and the defendant herself. *Id.* The essential inquiry is: "Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee?" *Id.* at 531.

Rideaux testified that she was a CPS foster-care supervisor in Jefferson County. When Rideaux first met with appellant in jail, appellant had an infant daughter who was in the care of CPS and three other children who needed "placement." When the prosecutor asked Rideaux what appellant said to her during their meeting, appellant objected to any "custodial statements made under questioning by the state" and requested a hearing on the admissibility of the statements. Outside the presence of the jury, Rideaux testified that she met with appellant in jail on June 27, 2003, and July 10, 2003. She denied questioning appellant at the direction of law enforcement. She testified that her purpose for interviewing appellant was "[t]o discuss the removal reasons, as well as to obtain information regarding the children's health, social and educational history, also to obtain social history from her regarding her family and to discuss possible options for relative placement." She needed to know if appellant's family had any knowledge of what she had done because there were family members who were willing to care for the children. She testified that "[i]n foster care we have limited contact as far as with law enforce-

---

3. Appellant also claims that the admission of Rideaux's testimony violated her rights under the Texas Constitution. Because appellant does not provide separate authority or argu- ment for her state constitutional claim, we do not address it. *Heitman v. State,* 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App.1991).

ment." She told appellant that she was not there to act on behalf of law enforcement. She did not give appellant *Miranda* warnings because she "was not there doing an investigation." After hearing her testimony, the trial court made findings on the record.

> I find that the statements made by [appellant were] made freely and voluntarily. I also find that while [appellant] was in custody that these statements were not pursuant to a custodial interrogation, as it was not in connection with a criminal investigation. Therefore, I'm going to allow the testimony.

Rideaux then testified before the jury that appellant had been charged with the capital murder of Malachi by the time Rideaux met with her in jail on July 10, 2003. Rideaux told appellant that the CPS placement decision would be affected if her family had any knowledge about Malachi or other hidden pregnancies. Appellant said that "she knew how to hide a pregnancy" and that her family had no knowledge of Malachi. She explained that she gave birth to him at home in her apartment, that it was an "easy delivery," that he was "fine" when he was born, that she had duct tape "lying around the house," and that she transported him in a trash bag to a dumpster without anyone's knowledge.

Rideaux was not an agent of law enforcement who was required to comply with *Miranda* and Article 38.22. Rideaux's purpose was to find a placement for appellant's children. Since a family placement was being considered, Rideaux needed to determine if appellant's relatives knew about the death of Malachi or the abandonment of appellant's infant daughter. Rideaux clearly denied having a law-enforcement purpose or acting at the direction of the police. There is nothing in the record to indicate that the police used

Rideaux to gather evidence to be used against appellant in this capital-murder prosecution. Appellant did not testify regarding her perceptions of her encounters with Rideaux, but Rideaux testified that she told appellant that she was not there to act on behalf of law enforcement. The trial court did not abuse its discretion in admitting Rideaux's testimony regarding appellant's statements. Point of error two is overruled.

## EXTRANEOUS OFFENSES

In points of error three and four, appellant complains about the admission of extraneous offenses at the guilt phase of the trial. She argues that the admission of evidence of her "hidden pregnancies" and the abandonment of Paris violated Texas Rule of Evidence 404(b). In point of error five, appellant asserts that the admission of this evidence violated Texas Rule of Evidence 403 because "[t]he prejudicial effect of the subject extraneous acts outweighed any probative value."

Rideaux first testified about appellant's hidden pregnancies when the prosecutor questioned her about her meeting with appellant in jail on July 10, 2003:

Q. What did you tell her was the concern that your agency had?

A. Regarding the removal?

Q. Of the older three children, yes.

A. Our concerns were that we had the pending capital murder case regarding Baby Hope. At that point in time, she ... had given birth to several children. Her mother only had knowledge of one of those births. We didn't know what information or what part, if any, that the family had regarding Baby Hope.

Q. And what would that—if the family knew about Baby Hope or other pregnancies that were hidden,

would that affect your decision regarding placement?

A. Yes, it would.

Q. Were there other pregnancies that were hidden?

A. Yes.

Q. Did you discuss that with Ms. Berry?

[DEFENSE COUNSEL]: Your Honor, I have to object to that. It's referring to extraneous matters not admissible in the trial of this cause.

THE COURT: Overruled.

Q. Did you discuss that with [Appellant]?

A. Yes, I did.

Q. And did she tell you whether or not she hid any of her other pregnancies?

A. She stated she knew how to hide a pregnancy.

 Rule 33.1 of the Texas Rules of Appellate Procedure provides that an objection must be timely and sufficiently specific to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. Appellant's objection to "extraneous matters," although not as precise as it could be, was sufficient under the circumstances to apprise the trial court that she was objecting under Texas Rule of Evidence 404(b). *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex.Crim.App.1990). However, the Rule 404(b) objection was not timely because it was made after Rideaux had already testified that there were other hidden pregnancies. Appellant also failed to preserve her Rule 403 claim because she did not further object on that basis. *Id.* at 388.

The prosecutor later questioned appellant about the abandonment of her infant daughter:

Q. Who's your fifth child?

A. Paris.

Q. Paris. Who's Paris' father?

A. Leonard Carrier.

Q. What did you do with Paris?

[DEFENSE COUNSEL]: Your Honor, I have to object to any reference to any extraneous matter that's not appropriate for this jury.

THE COURT: Overruled.

[PROSECUTOR]: I submit 404(b), Your Honor, to show intent.

Q. What did you do with Paris?

A. (No response)

[DEFENSE COUNSEL]: And Your Honor, we would also object under 404(b) that the prejudicial effect outweighs any probative value to that particular thing.

THE COURT: That's overruled.

Following this exchange, appellant refused to give any testimony about her abandonment of Paris, despite the prosecutor's repeated questions and the trial court's instructions to answer them. Even though defense counsel's objection was timely and sufficiently specific to preserve the alleged Rule 404(b) and Rule 403 errors, appellant gave no testimony on this particular topic.

 After appellant testified, the prosecutor re-called Rideaux to ask her about appellant's abandonment of Paris:

Q. Ms. Rideaux, did you talk to [appellant] regarding the incident concerning her child, Paris Berry?

A. Yes.

[DEFENSE COUNSEL]: Your Honor, could we, just for the purposes of the record, have a running objection to any testimony concerning extraneous offenses?

THE COURT: Yes, sir.

[DEFENSE COUNSEL]: I assume the ruling of the Court is the same?

THE COURT: Overruled.

In this instance, appellant made an objection that was timely and sufficiently specific to preserve her Rule 404(b) challenge to Rideaux's subsequent testimony. After the trial court overruled appellant's objection, Rideaux testified that appellant told her "she had placed [Paris] out on Hillebrandt Road." Appellant had previously stated that someone helped her, but then changed her story, telling Rideaux that she acted alone. Rideaux testified that appellant said that "she knew how to hide a pregnancy and that her weight fluctuated a lot," and she appeared to be proud of that fact.

While evidence of other crimes, wrongs or acts is not admissible "to prove the character of a person in order to show action in conformity therewith," it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R. EVID. 404(b). This list is illustrative, not exhaustive. *Johnston v. State,* 145 S.W.3d 215, 219 (Tex.Crim.App.2004). For example, extraneous-offense evidence may be admissible when a defendant raises an affirmative defense or a defensive issue that negates one of the elements of the crime. *Id.*

The state argues that the subsequent hidden pregnancy and abandonment of Paris showed that appellant "was keeping the children fathered by Joskin Love, and discarding the children fathered by other men," thus demonstrating her motive and her intent to kill Malachi. Appellant's intent was a disputed issue in this case. Appellant's defensive theory was that the baby died of natural causes. She denied killing her child, and the defense and state experts disagreed about the cause of death. Appellant testified that Jasmine, Keerstan, and Joskin were fathered by

Joskin Love. She acknowledged that Malachi and Paris were fathered by two different men, and she "kept to [herself]" with regard to those pregnancies. Rideaux then confirmed that appellant "knew how to hide a pregnancy" and abandoned Paris on the side of a road shortly after birth. Rideaux's testimony was admissible to prove appellant's motive and her intent to kill Malachi. The trial court's decision to admit this evidence was within the zone of reasonable disagreement and was not an abuse of discretion. *Santellan,* 939 S.W.2d at 169. Points of error three, four, and five are overruled.

## JURY ARGUMENT

In point of error six, appellant claims that the prosecutor misstated the evidence in his closing argument at the guilt phase of the trial. Appellant specifically complains about the following portion of the prosecutor's argument.

[PROSECUTOR]: Did you hear [appellant] when she testified? She used the words "that baby." She didn't use Malachi. She didn't tell you, "I loved Malachi." She didn't say any of that.

[DEFENSE COUNSEL]: Your Honor, I do have to object that it misstates the testimony because I think she referred to it as "my baby" throughout.

THE COURT: Overruled. The jury will be instructed to recall the testimony.

Appellant contends that she never referred to her child as "that baby" when she testified at trial. The state concedes on appeal that "[t]he prosecutor did misstate how Appellant had testified," but argues that the prosecutor "was simply mistaken" and that any error was harmless.

There are three factors to consider when assessing the impact of the harm arising from jury argument error: (1) the

severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and, (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998); *Threadgill v. State*, 146 S.W.3d 654, 666–67 (Tex.Crim.App.2004).

The prosecutor's statement does not amount to severe misconduct. He did not repeat the statement after appellant objected to it. The trial court overruled appellant's objection, but instructed the jury "to recall the testimony." Rideaux specifically testified at trial that appellant referred to the victim as "that baby" during their interviews. The prosecutor's argument focused on other, more damning, evidence, such as appellant covering the victim with duct tape and a plastic bag, disposing of him in a dumpster, and later abandoning another newborn on the side of a road. The state concedes this error, but the error did not affect appellant's substantial rights, and we must therefore disregard it. TEX.R.APP. P. 44.2(b). Point of error six is overruled.

■ In point of error seven, appellant again complains of improper jury argument at the guilt phase. Appellant asserts that the prosecutor improperly struck at appellant over the shoulders of defense counsel when he argued that defense counsel told an expert witness that "we're looking for a defense." The prosecutor made the statement at issue during his closing argument.

[PROSECUTOR]: ... The defense controlled how much information got to both of those experts. You heard [the prosecutor] go, "What did you examine? Did you ever examine the victim, or did you ever look at the pictures? Did you ever contact any of the witnesses? Did you contact C.P.S.? Did you talk to the family? Did you talk to the defendant?" Things that Dr. Pustilnik said that you should do.... He violated his own protocol. He told you what his agenda was from the beginning.

[Pustilnik] goes, "My first impression was homicide." But then the defense tells him, "Well, we're looking for a defense. We're looking—and the defendant's told us that—"

[DEFENSE COUNSEL]: Your Honor, I have to object. It's outside the record, and we never told any expert witness we're looking for a defense. It's outside the record and simply not true, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: You can ask for Dr. Pustilnik's testimony. Dr. Pustilnik said, in talking to [defense counsel], the defendant told them that the baby had died before she put him in the bag. So, they were looking for a defense. He knew what he needed to do before he came to one of his conclusions. And what did he do? Did he contact, did he talk to Dr. Brown? The answer's "no." Did he contact any of the people involved? No. Did he talk to the defendant? No. Did he talk to the family? And God bless, they've had to go through this.

■ Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Cannady v. State*, 11 S.W.3d 205, 213 (Tex.Crim. App.2000). We have consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper. *Wilson v. State*, 7 S.W.3d 136, 147 (Tex.Crim.App.1999); *Dinkins v. State*,

894 S.W.2d 330, 357 (Tex.Crim.App.1995). Even assuming that appellant's objection was sufficient to preserve her claim on appeal, her claim fails because the prosecutor's argument was a reasonable deduction from the evidence.

Pustilnik initially told the prosecutor on cross-examination that his opinion about the cause of death was based on his review of the autopsy, not on what defense counsel told him. When defense counsel later questioned him on re-direct examination, the following exchange occurred:

Q. Now, the first time you and I met, do you remember what you told me about the cause of death in this case?

A. Oh, yes I do.

Q. What did you tell me?

A. I said it looks like a homicide to me.

\* \* \*

Q. But you wanted to see what?

A. I wanted to see the autopsy slides, I wanted to see the autopsy photographs, I wanted to see the rest of the case.

Q. And why did you want to see that?

A. Because you told me that the child had—the statement—can I say that—that the theory was that the child was dead prior to being put in the bag. And therefore, since that was the theory, it would have been my job, if this were my case, to prove or disprove that the child could have died prior to being put in that bag. So, I wanted to see everything that was done to look for a natural disease that either proved natural disease was there or proved natural disease was not there.

The prosecutor revisited this matter again on re-cross examination:

Q. Dr. Pustilnik, you said that the defense counsel contacted you and they wanted to show that the child was already dead when it was placed in the bag? Is that what you said?

A. No, they said that one of the explanations offered by the defendant was that the child was already dead when it was placed in the bag, yes.

The prosecutor was directly referring to Pustilnik's testimony when he made the statement at issue during closing argument. It is a reasonable deduction from Pustilnik's testimony as a whole that defense counsel told Pustilnik that at least one defensive theory was "that the child was dead prior to being put in the bag" and that Pustilnik looked at the autopsy with this potential alternative in mind. The prosecutor's statement, although aggressive, fell within the bounds of permissible jury argument and did not strike at appellant over the shoulders of defense counsel. Point of error seven is overruled.

## SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

■■■ In point of error eight, appellant argues that the evidence is legally insufficient to support the jury's affirmative finding on the future-dangerousness special issue. We view the evidence in the light most favorable to the jury's finding and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). If, given all of the evidence, a rational jury would have necessarily entertained a reasonable doubt as to the probability of appellant's dangerousness in the future, we must reform the trial court's

judgment to reflect a sentence of life imprisonment. *Holberg v. State,* 38 S.W.3d 137, 139 (Tex.Crim.App.2000); Article 44.251(a).

The state presented evidence at punishment detailing appellant's abandonment of her infant daughter Paris nearly five years after the death of Malachi. Andrew Durham testified that he heard a baby crying as he was walking along Hillebrandt Road in Jefferson County between 6:30 a.m. and 7:00 a.m. on June 6, 2003. He found Paris lying on her back in a ditch approximately fifteen feet from the road. She was naked and had fire ants all over her body. Durham alerted his wife, who was a nurse, and she took Paris to the hospital. Paris had extensive ant bites and her eyes were swollen shut. She needed a blood transfusion and experienced seizures in the hospital. Tracy Rideaux testified that CPS was appointed as Paris's managing conservator and that she was later placed in foster care. Rideaux reported that Paris still has scars from the ant bites on her face, arms, and stomach.

Investigator Beavers testified appellant first told her that she wanted Joskin Love to take her to the hospital, but he instead drove them out to Hillebrandt Road and placed Paris on the ground. When Beavers informed appellant that Love had an alibi, she admitted that Love was not involved. She said that she was sorry for what she had done, but she did not express remorse about the child. Beavers testified, "Her biggest concern when she was crying the first time I talked to her was that she was worried about what everybody was going to think and what everybody would say and how mad her momma was going to be at her for coming and talking to us."

Rideaux testified that appellant's oldest two children, Jasmine and Keerstan, had been in counseling since their mother had been jailed on capital-murder charges. Jasmine had been diagnosed with post-traumatic-stress disorder. Rideaux testified that Jasmine had expressed fear and "wondered why her mom had [done] this to Baby Hope and Paris and why she had not killed them."

Defense counsel called appellant's cousin, aunt, and mother to testify on appellant's behalf at punishment. They testified that appellant was a shy and respectful child and a loving and caring mother to Jasmine, Keerstan, and Joskin. They testified that her behavior regarding Malachi and Paris was totally out of character. Appellant's cousin reported that appellant had previously been employed in a fast food restaurant, a prison, and a child-care facility. Appellant's aunt and cousin acknowledged that appellant had hidden all but one of her pregnancies from her family. They testified that appellant's children loved her, and that it would negatively impact them if she received a death sentence.

Defense counsel presented the testimony of Dr. Oney Fitzpatrick, a developmental psychologist who had done a social study of appellant's background. He reported that she was a shy and socially isolated child and was cooperative, yet unmotivated, at school. She was a "good worker" when she was employed at the Texas Department of Corrections, but eventually had to leave that job because of "absenteeism." Fitzpatrick thought that appellant appeared to be clinically depressed, a condition that could cloud her judgment and affect her decision-making processes. Appellant expressed love for Jasmine, Keerstan, and Joskin and denied killing Malachi. She told Fitzpatrick that when she first became pregnant she worried that she would disappoint her mother and grandmother because she had failed to live up to their expectations. Fitzpatrick

believed that there were mitigating circumstances in that appellant "was under an extreme amount of pressure," and her "sociocultural background [did] not promote reaching out to others for assistance."

Defense counsel also presented the testimony of psychiatrist Dr. Edward Gripon, who testified that appellant had been diagnosed with clinical depression in jail and had been placed on antidepressants. He suspected that appellant had been depressed for "quite some time," but had never sought treatment. He testified that clinical depression could impair appellant's judgment and decision-making processes. Appellant denied killing Malachi, but expressed remorse for what had happened. She told Gripon that she had abandoned Paris because she could not care for her and wanted to sever her relationship with Paris' father. Gripon thought that there was a low risk of future dangerousness because the incidents involving Malachi and Paris were unique and that there was only a remote possibility that appellant would become pregnant in prison. Given those circumstances, he saw little likelihood of appellant being a danger to society in the future.

Finally, the state called rebuttal witness Linda Ament, the former warden of a women's prison who had been employed by the Texas Department of Criminal Justice (TDCJ) for twenty-three years. She testified that female prisoners had become pregnant after having sexual relations with male prison guards or other staff. She acknowledged that "the only way prison staff would know that somebody's pregnant is either that somebody tells them or they're able to see that that person's pregnant." On cross-examination by defense counsel, Ament testified that she had encountered over 3,000 female inmates in her years of employment at TDCJ. During

that time, she had been personally aware of two inmates who became pregnant and had heard about two to three others. She acknowledged that there was an extremely low likelihood that a female inmate would become pregnant while in prison and that it was a "possibility" rather than a "probability" that such a situation would occur.

Appellant argues that there was insufficient evidence of future dangerousness because she had no prior criminal background, and the defense experts testified that she had a low risk of future dangerousness. Appellant also relies on Ament's testimony that she knew about only five instances of pregnancy in the 3,000 female inmates she had encountered in her twenty-three years at TDCJ. Appellant asserts that "[s]imple math establishes that the likelihood of appellant becoming pregnant in prison ... would be 5 out of 3,000, or .16%." Appellant argues that the defense experts established she "had been a threat only to two of her own children, a threat which [would be] virtually eliminated by a sentence of life imprisonment throughout her child-bearing years."

At punishment, the state argued to the jury that the death penalty should be assessed.

You've heard about future danger and you heard Dr. Gripon, who was hired by the defense and he said that she's not a future danger because the victim pool was low because in prison she's not going to have access. Remember, we talked to you about what society was. We talked about it for a long time.... Imaginary circle—what does society mean to you folks? You-all agreed it was anyone around her. And we all asked you, when you're asking yourself that question, you have to assume whether she's a future danger sitting there as she sits today, if she was out among us, among other children, is she a

future danger. Everything Dr. Gripon said was based on one premise, that she's locked up and that somebody, not her, somebody else, would intervene to protect that child. Remember, he said that she'll be locked up. Well, that assumes the system is locking her up. . . . That assumes that she's locked up.

*I submit to you the way you answer this question is if she was out and she's among her children or she has another child, do you think she's a future danger to that child. . . . Some people are just evil.* (Emphasis added.)

The state's argument clearly asked the jury to assume that appellant would be living in the free world. Our precedent states clearly that "society," as used in Art. 37.071, includes both prison and the "free world," and the jury must consider dangerousness in that context. *See, e.g., Muniz v. State,* 851 S.W.2d 238, 250 (Tex. Crim.App.1993)(state required to prove that "appellant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison."); *Jones v. State,* 843 S.W.2d 487, 495 (Tex.Crim.App.1992)(" 'society' includes not only free citizens but also inmates in the penitentiary."). The state's argument, therefore, was a misstatement of the special issue[4] in that the argument told the jury that the only society it should consider was the free world. The jury had

just convicted appellant of capital murder. The only two possible sentences for such a conviction are death and life in prison; there is no probation for capital murder, no release to the free world in the near term. Appellant was, without doubt, going to be "locked up," either on death row or in the general prison population for a minimum of forty calendar years. The state's argument therefore both misstated the law and misdirected the attention of the jury away from a determination of whether she would be a continuing danger in the actual circumstances in which she would be living (prison) and toward a determination of her continuing dangerousness in circumstances in which she most assuredly would not be (the free world).[5]

We hold that the state did not meet its burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison. *Holberg,* 38 S.W.3d at 138–9. Appellant murdered one child and abandoned another, but defense witnesses testified that these two incidents were out of character and that she was a loving and caring mother to her other three children. Appellant's expert witnesses opined that she was depressed and under extreme stress when she killed Malachi and, five years later, abandoned Paris. She had no

4. CODE CRIM. PROC. ART. 37.071, § 2(b)(1): "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]"

5. Children who kill their parents cannot commit that offense again, but such persons may also be shown to have violent tendencies toward persons other than their parents. If no such tendencies are shown, a rational jury would be justified in finding a lack of future dangerousness. A middle-aged serial killer of children is not subject to the "aging out" of

that predilection, but remains dangerous to children regardless of time spent in prison or age at the time of release. (There is also no mandatory minimum term and such persons are, at least in theory, eligible for parole in fewer than forty calendar years.) That is not the case here. Appellant has been shown to pose a danger only to her own children. She will, without doubt, reach menopause and be unable to bear more children before she has served the minimum of forty calendar years and has passed the age of 60.

criminal record, and the state presented no other evidence of violence in her past. All of her offenses involved a pregnancy, but testimony from both defense and state witnesses showed that her potential for becoming pregnant while incarcerated would be "extremely low." Further, appellant was in her twenties when she was convicted of capital murder. If she received a life sentence and were paroled forty years later, she would be in her sixties and likely beyond her childbearing years and thus could not repeat such an offense.

We rarely reverse a judgment on a claim of insufficient evidence to support a finding that the defendant will be a danger in the future, and we do not do so lightly. In this case, we understand the jury's decision in response to the death of one infant and the abandonment of another, even if that decision is not supported in law.[6] The state's evidence, which consisted of appellant's murder of Malachi, her subsequent abandonment of Paris, her lack of remorse for these crimes, and the unlikely possibility that she might become pregnant in prison, does not prove beyond a reasonable doubt that there is a probability that she would commit criminal acts of violence that would constitute a continuing threat to society. While the state quite certainly proved that appellant showed a pattern of keeping the children sired by one man and discarding the children sired by other men, it did not prove that any other stimulus led to a violent or dangerous act in any other context. It did not show that she had harmed or attempted to harm any of her other children, an unrelated child, or any other person. Further, the state's final argument exacerbated the heavy emotional

impact of the offense by inviting the jury to use an improper standard in its consideration of future dangerousness.

The evidence indicates that appellant has been dangerous only toward those of her own children whose existence she wanted to hide from her favored mate, that there is a very low probability that, if sentenced to life in prison, she will have any more children, and that therefore it is unlikely that she would be a danger in the future. Point of error eight is sustained.

### Conclusion

Because a rational jury would have necessarily entertained a reasonable doubt as to the probability of appellant's future dangerousness, we affirm the judgment of conviction and reform the trial court's judgment to reflect a sentence of imprisonment for life. Because this holding affects only the death penalty and any other points of error relative to the jury's findings on the issue of punishment, appellant's ninth point of error, in which she claims that "[t]he evidence was insufficient to support the negative answer to the special issue regarding mitigating circumstances," is moot.

The judgment, as reformed, is affirmed.

HERVEY, J., filed a dissenting opinion in which KELLER, P.J., MEYERS and KEASLER, JJ., joined.

HERVEY, J., dissenting in which KELLER, P.J., MEYERS and KEASLER, JJ., joined.

I respectfully dissent. At the very least, a rational jury could have found that there

---

**6.** The state repeatedly described appellant as evil, a powerful word. The jury may well have agreed with that assessment, but "just evil" does not equate with "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Robert Hanssen, an FBI agent, and Aldrich Ames, a CIA counter-intelligence officer, both of whom spied for Russia, are likely considered "evil" by many persons, but they have never been accused of committing criminal acts of violence.

is a probability that appellant would be dangerous to her unwanted babies. A rational jury could even have found that appellant **would,** in fact, be very dangerous to that segment of society. This should, as a matter of appellate review, be dispositive of appellant's sufficiency challenge to the jury's finding on the future-dangerousness special issue.

The Court nevertheless decides that the State failed to meet its burden of proof on the future-dangerousness special issue. The Court's opinion states:

> We hold that the state did not meet its burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison. (Citation omitted). Appellant murdered one child and abandoned another[ 1], but defense witnesses testified that these two incidents were out of character and that she was a loving and caring mother to her other three children. Appellant's expert witnesses opined that she was depressed and under extreme stress when she killed Malachi and abandoned Paris. She had no criminal record, and the state presented no other evidence of violence in her past. Each of her offenses involved a pregnancy, but testimony from both defense and state witnesses showed that her potential for becoming pregnant while incarcerated would be "extremely low." Further, appellant was in her twenties when she was convicted of capital murder. If she received a life sentence and were paroled forty years later, she would likely be beyond her childbearing years and thus could not repeat such an offense. The state's evidence, which consisted of appellant's murder of Malachi, her subsequent abandonment of Paris, her lack of remorse for these crimes, and the unlikely possibility that she might become pregnant in prison, does not prove beyond a reasonable doubt that there is a probability that she would commit criminal acts of violence that would constitute a continuing threat to society.

Maj. op. at 863–64.

This analysis does not "view the evidence in the light most favorable to the verdict." *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). It credits evidence and inferences therefrom that a rational jury could have rejected and discredits other evidence and reasonable inferences therefrom upon which a rational jury could have based an affirmative answer to the future-dangerousness special issue. *But see id.* (sufficiency standard does not permit appellate court "to make its own subjective determination"). This usurps the jury's role and places the Court in the role of asking whether *it* believes, instead of asking whether a rational *jury* could have believed, that there is a probability that appellant would be dangerous. *But see id.*

The State presented evidence that in 1998 appellant murdered her new-born child named Malachi by duct-taping his mouth shut while still alive, by duct-taping his arms to his side to immobilize him, and by placing Malachi in a garbage bag and throwing him in a trash dumpster where he suffocated to death. Five years later, appellant tried to murder another of her new-born children named Paris by placing Paris, naked, on a fire-ant mound at a remote location where it was extremely unlikely that Paris would be found alive.

---

1. It is not entirely accurate to merely state that appellant abandoned Paris. A rational jury could have found that it was appellant's conscious desire to kill Paris.

These were calculated crimes conceived and carried out by appellant alone apparently with the motive to keep the father of her other three children from discovering that she was "messing" with someone else. Appellant has shown no remorse whatsoever for her attempted and successful acts of infanticide. She has failed to take any responsibility for Malachi's death. She blamed someone else for trying to murder Paris, but this deception could not withstand scrutiny. She "plead the Fifth" and accused the prosecutor of having a "personal vendetta" against her when the prosecutor began to question her at trial about how Paris ended up naked on a fire-ant mound in a remote location.[2]

Q. [PROSECUTION]: What did you do with Paris?

[THE DEFENSE]: Your Honor, I have to object to any reference to any extraneous matter that's not appropriate for this jury.

[THE COURT]: Overruled.

[THE PROSECUTION]: I submit 404(b), Your Honor, to show intent.

Q. What did you do with Paris?

A. [APPELLANT]: (No response)

[THE DEFENSE]: And Your Honor, we would also object under 404(b) that the prejudicial effect outweighs any probative value to that particular thing.

[THE COURT]: That's overruled.

Q. Didn't you take Paris out on Hillebrandt Road and dump her in an ant bed?

A. I plead the Fifth.

Q. You can't plead the Fifth.

A. Well, I am.

Q. Because you're on the stand. Tell the jury what you did to Paris, Ms. Berry.

A. This is my trial about Malachi, not Paris.

Q. Tell the jury what you did to Paris.

A. I'm charged with capital murder. Paris is still alive.

[THE PROSECUTION]: I would ask the Court to instruct the witness to answer the question.

[THE COURT]: Ms. Berry, I'm going to instruct you to answer the question.

A. This is a capital murder trial.

Q. You took Paris out on Hillebrandt Road last summer and dumped her in an ant bed; and she's alive, isn't she? I saw her today.

A. Really?

Q. Yes, complete with the scars from the ant bites. Tell the jury what you did to Paris.

[THE DEFENSE]: Your Honor, I have to object. For one thing, the prosecutor's screaming; and I think that's inappropriate in the courtroom. And secondly, the prosecutor's testifying as to what he's seen and if he wants to take the stand, I'll be happy to cross examine him, but he's not a witness.

[THE COURT]: Overruled. Ms. Berry, I'm going to instruct you again to answer the question.

[APPELLANT]: It's okay that he's yelling. It's a personal vendetta that he got against me.

[THE PROSECUTION]: I would once again ask the Judge to instruct Ms. Berry to answer the question.

[THE COURT]: Ms. Berry, I'm going to instruct you again to answer the questions that he's asking you.

2. Appellant had testified on direct-examination that Malachi died a natural death and that she duct-taped him and threw him in the garbage. She never explained, on either direct-examination or on cross-examination, what happened to Paris.

[APPELLANT]: If it don't have nothing to do with this trial—

* * *

Q. Tell the jury what you did to Paris.

A. You tell them.

Q. What did you do to her, Ms. Berry? Did you do anything to her?

A. (No response)

Even appellant's own expert (Gripon) provided testimony that supports a finding that there is a probability that appellant would be dangerous in the "free world" to her unwanted babies.

Q. [PROSECUTION]: If she gets in a circumstance where she is around a child that she doesn't want or doesn't care for in the future, what do you think she's going to do?

A. [GRIPON]: Well, I don't think that's going to happen.

Q. But if it does—

A. Given her circumstances. If it were a child that she had given birth to under similar circumstances to those that we've looked at here, I would consider that a high risk situation. In other circumstances, I would not consider it to be substantially risky at all; but I certainly would not suggest that she become pregnant and give birth in an unsupported setting alone and face whatever kind of impact she feels that would have on her life, if that were possible, although I can't conceive of a set of circumstances in which that's possible.

Q. But she's already done it five times.

A. Done what, given birth?

Q. Getting pregnant without people knowing.

A. Well, I don't know whether all of those were unknown. I know that most were. That's true.

During closing jury arguments at the punishment phase, the prosecution stated to the jury that the way to answer the future-dangerousness special issue was if appellant "was out and she's among her children or she has another child, do you think she's a future danger to that child." The prosecution also deduced from the evidence that appellant is "evil" and asked the jury to "imagine someone more evil than would do these two things to two different children on two different days five years apart."

Now, you've heard a bunch of testimony. You've heard about future danger and you heard Dr. Gripon, who was hired by the defense and he said that she's not a future danger because the victim pool was low because in prison she's not going to have access. Remember we talked to you about what society was. We talked about it for a long time. Society—when I talked to you guys—I'm going to do this. Imaginary circle—what does society mean to you folks? You—all agreed it was anyone around her. And we all asked you, when you're asking yourself that question, you have to assume whether she's a future danger sitting there as she sits today, if she was out among us, among other children, is she a future danger. Everything Dr. Gripon said was based on one premise, that she's locked up and that somebody, not her, somebody else, would intervene to protect that child. Remember, he said, oh, she'll be locked up. Well, that assumes the system is locking her up. Well, somebody would catch her. That assumes somebody else will see that she's pregnant, somebody that's more perceptive than the family that she's hid all these pregnancies from. That assumes that even after she has the baby that they could intervene and get to her. That assumes that she's locked up.

I submit to you the way you answer this question is if she was out and she's among her children or she has another child, do you think she's a future danger to that child. What was not asked of Dr. Gripon was how many victims in her way does it take to convince him or anybody that she's a future danger. A person repeatedly trying to kill her children, I submit to you, that is an obvious answer. Regardless of what the answer to your second question is, the first one should be a resounding "yes." She murdered [Malachi]. She lied to Dr. Gripon, "Oh, I didn't do it." So, did he assume that she's telling him the truth; or do you assume she was lying? The material-the information he bases his answers on were partially based on the story from her. And you got a big taste of her yesterday. She's still lying. She lied to her family, she lied to Gripon and she lied to you. So, how many children do we have to bury before you're convinced that she's a future danger? Some of you-all said one. I would hope all of you say two.

\* \* \*

There is an evil and dark side to this woman that her family does not know. There is an evil and dark side to this woman that very few people have realized until we see what she creates because the opposite of creation is destruction; and she has destroyed lives everywhere she goes. And you ask yourself is she a future danger today, was she a future danger in 1996 when she had her first baby, oh, yeah. Was she a future danger in 1997, was she a future danger in 1998, was she a future danger on June the 5th of 2003, the day before she dropped her most recent

child into a fire ant bed. What has changed from that day to today as she sits there? Absolutely nothing, absolutely nothing.

There has been no showing of remorse. There has been no showing of psychological damage or drug abuse. She came from a beautiful home with a loving family. Some people are just evil. Some people are just evil. And I want you to imagine someone more evil than would do these two things to two different children on two different days five years apart.

The future-dangerousness special issue asks the jury to decide "whether there is a probability that the defendant **would** commit criminal acts of violence that **would** constitute a continuing threat to society." *See* Article 37.071, § 2(b)(1), Tex.Code Crim. Proc., (emphasis supplied). The Court's opinion also seems to acknowledge that this special issue asked the jury to decide if there is a probability that appellant would be dangerous "in or out of prison." Maj. op. at 23 ("state did not meet its burden of *proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison*"); *see Salazar v. State,* 38 S.W.3d 141, 145–46 (Tex.Cr.App.2001) (defendant, who was convicted of murdering two-year-old daughter of his girlfriend, presented expert witness who admitted that defendant would be dangerous in the "free world"); *Smith v. State,* 898 S.W.2d 838, 851 n. 19 (Tex.Cr.App.1995) (future dangerousness special issue requires jury to decide if the defendant would be dangerous "whether he is in prison or out of prison").[3] This is

---

**3.** The Legislature's use of "would" instead of "will" in the future-dangerousness special is-

sue also supports the claim that this special issue asked the jury to decide, among other

also consistent with the State's closing jury arguments during the punishment phase that appellant would be dangerous "if she was out and she's among her children or she has another child."

The future-dangerousness special issue, therefore, does not exempt from the death penalty those defendants who are dangerous only to a segment of society that they probably will not encounter in prison or are not likely to encounter again if they are paroled forty or so years later. *See* Footnote 3. If that was true, the future-dangerousness special issue would exempt from the death penalty most parents who murder their children, contrary to the clear legislative intent expressed in Section 19.03(a)(8) making it a capital offense for a person to murder "an individual under six years of age." It would also exempt from the death penalty many other killers such as children who murder their parents and middle-aged serial killers who prey on young children.

In this case, a rational jury could have found that there is a probability that appellant would be dangerous "out of pris-

on." She cold-heartedly murdered one child and attempted to murder another child on different occasions five years later. She is unremorseful and fails to take responsibility. This evidence satisfies every measure of future-dangerousness that this Court has applied. *See, e.g., Salazar,* 38 S.W.3d at 145–46 (lack of remorse and failure to take responsibility are factors that support jury's affirmative answer to "future-dangerousness" special issue).[4] A rational jury could have found that appellant is the same unremorseful, cold-blooded killer that she was in 1998 when she murdered Malachi and that she was in 2003 when she tried to murder Paris.[5] That appellant might be controlled in prison in no way detracts from this or a rational finding that there is a probability that she *would* be dangerous to her unwanted children.

I respectfully dissent.

---

things, whether there is a probability that appellant would be dangerous "if she was out among us." It is not dispositive of appellant's sufficiency claim that she might not murder any more of her children because of a low probability that she will not have any more children, if sentenced to life in prison. This Court has held that "society includes not only free citizens but also inmates in the penitentiary." *See McDuff v. State,* 939 S.W.2d 607, 620 (Tex.Cr.App.1997); *Jones v. State,* 843 S.W.2d 487, 495 (Tex.Cr.App.1992).

4. This evidence satisfies at least five of the eight "non-exclusive list of factors that may be considered in determining whether a defendant constitutes a continuing threat to society" set out in numerous decisions of this Court such as *Solomon v. State,* 49 S.W.3d 356, 362–63 (Tex.Cr.App.2001). These non-exclusive factors are:
 (1) the circumstances of the capital offense, including the defendant's state of mind and whether [s]he was acting alone or with other parties;
 (2) the calculated nature of the defendant's acts;
 (3) the forethought and deliberateness exhibited by the crime's execution;
 (4) the existence of a prior criminal record and the severity of the prior crimes;
 (5) the defendant's age and personal circumstances at the time of the offense;
 (6) whether the defendant was acting under the duress or the domination of another at the time of the commission of the offense;
 (7) psychiatric evidence; and
 (8) character evidence.

5. Appellant is not very different from other defendants who have been convicted and sentenced to death for murdering their children. *See, e.g., Routier v. State,* 112 S.W.3d 554, 557 (Tex.Cr.App.2003); *O'Bryan v. State,* 591 S.W.2d 464, 467–70,480–81 (Tex.Cr.App. 1979).