FILED IN
COURT OF CRIMINAL APPEALS

July 20, 2015

ABEL ACOSTA, CLERK

AP-77,034
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/20/2015 1:52:16 PM
Accepted 7/20/2015 2:22:10 PM
ABEL ACOSTA
CLERK

**NO. AP-77,034**

IN THE

COURT OF CRIMINAL APPEALS

AT AUSTIN, TEXAS

| | | |
|---|---|---|
| BRANDON DANIEL | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

APPEAL FROM THE 403RD JUDICIAL DISTRICT COURT

TRAVIS COUNTY, TEXAS

CAUSE NO. D-1-DC-12-201718

STATE'S BRIEF

**ROSEMARY LEHMBERG**
District Attorney
Travis County, Texas
**Lisa Stewart**
Assistant District Attorney
State Bar No. 06022700
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. 854-4810

Oral Argument Not Requested

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................2

INDEX OF AUTHORITIES .........................................................................................4

STATEMENT OF THE CASE ......................................................................................5

STATEMENT REGARDING ORAL ARGUMENT .....................................................6

STATEMENT OF FACTS FROM GUILT/INNOCENCE...........................................6

Facts of this Capital Murder Committed at an Austin Walmart ................................. 6
Evidence Recovered After Appellant Taken into Custody........................................... 9
Forensic Evidence ...................................................................................................... 12
Evidence from Officer Padron's Autopsy.................................................................. 12
Officer Padron's Personal and Professional Background.......................................... 13
Defense Evidence at Guilt/Innocence ....................................................................... 15

STATEMENT OF FACTS FROM PUNISHMENT PHASE.....................................18

The Night of this Capital Murder Offense................................................................. 18
Lack of Remorse and Extraneous Bad Acts in Texas................................................ 18
Extraneous Bad Acts Committed in Colorado........................................................... 22
Extraneous Bad Acts and Disciplinary Violations in Jail......................................... 23
Appellant's Mail and Recorded Phone Conversations in Jail................................... 26
Inmate Classification System and Prison "Society" ................................................. 28
Officer Padron's Personal and Professional History ................................................ 30
Defense Evidence at the Punishment Phase............................................................... 32
State's Rebuttal Evidence at Punishment .................................................................. 38
The Verdict at the Punishment Phase ........................................................................ 40

SUMMARY OF THE ARGUMENTS ........................................................................41

State's Reply to Appellant's First Point of Error....................................................... 41
State's Reply to Appellant's Second Point of Error .................................................. 42
State's Reply to Appellant's Third Point of Error ..................................................... 43

**STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR** ........................44

The evidence was legally sufficient to establish that there is a probability that appellant would commit criminal acts of violence and constitute a continuing threat to society. ...................... 44
Standard and Scope of Review ................................................................. 44
Application of Law to Facts ..................................................................... 45

**STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR** ...................52

Appellant did not suffer harm as a result of the trial court's denial of his challenge for cause to venireperson Reading. Alternatively, the trial judge did not err in denying appellant's challenge for cause to venireperson Reading. ................................................................ 52
Appellant Cannot Show Harm .................................................................. 52
Alternatively, the Trial Judge Did Not Err in Denying the Challenge for Cause ................. 53

**STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR** ........................61

Appellant failed to preserve any alleged error for review because there was no adverse ruling. Alternatively, the trial court did not abuse its discretion in limiting the voir dire hearing to the expert's qualifications and the basis of her findings. ................................................................ 61
Relevant Facts ......................................................................................... 61
Appellant Failed to Preserve Any Alleged Error for Review ............................................... 62
The Trial Judge Afforded Appellant a Proper Rule 705(b) Hearing .................................... 63

**PRAYER** ................................................................................................65

**CERTIFICATE OF COMPLIANCE** ........................................................65

**CERTIFICATE OF SERVICE** ..................................................................66

# INDEX OF AUTHORITIES

## Cases

*Alba v. State*, 905 S.W.2d 581 (Tex.Crim.App. 1995), *cert.denied*, 516 U.S. 1077 (1996)......... 63

*Barley v. State*, 906 S.W.2d 27 (Tex.Crim.App. 1995) ................................................ 47

*Bell v. State*, 938 S.W.2d 35 (Tex.Crim.App. 1996), *cert.denied*, 522 U.S. 827 (1997)............. 45

*Beltran v. State*, 728 S.W.2d 382 (Tex.Crim.App. 1987) ................................................ 50

*Berry v. State*, 233 S.W.3d 847 (Tex.Crim.App. 2007)................................................ 50

*Chambers v. State*, 903 S.W.2d 21 (Tex.Crim.App. 1995) ......................................... 44

*Comeaux v. State*, 445 S.W.3d 745 (Tex.Crim.App. 2014)........................................... 53

*Davis v. State*, 313 S.W.3d 317 (Tex.Crim.App. 2010) ....................................... passim

*Devoe v. State*, 354 S.W.3d 457, 461-62 (Tex.Crim.App. 2011) ................................. 45

*Druery v. State*, 225 S.W.3d 491 (Tex.Crim.App. 2007) .......................................... 44

*Estrada v. State*, 313 S.W.3d 274 (Tex.Crim.App. 2010) ......................................... 46

*Feldman v. State*, 71 S.W.3d 738 (Tex.Crim.App. 2002)....................................... 58, 61

*Freeman v. State*, 340 S.W.3d 717 (Tex.Crim.App. 2011) ....................................... 44

*Fuller v. State*, 253 S.W.3d 220 (Tex.Crim.App. 2008), *cert.denied*, 555 U.S. 1105 (2009) ...... 63

*Gardner v. State*, 306 S.W.3d 274 (Tex.Crim.App. 2009) ......................................... 58

*Gonzales v. State*, 353 S.W.3d 826 (Tex.Crim.App. 2011).................................. 52, 58, 61

*Goss v. State*, 826 S.W.2d 162 (Tex.Crim.App. 1992), *cert.denied*, 113 S.Ct. 3035 (1993) ....... 64

*Huffman v. State*, 746 S.W.2d 212 (Tex.Crim.App. 1988)......................................... 50

*Jenkins v. State*, 912 S.W.2d 793 (Tex.Crim.App. 1995) (op. on reh'g.)................................... 62

*Soliz v. State*, 432 S.W.3d 895 (Tex.Crim.App. 2014)........................................ 44, 45

*Williams v. State*, 273 S.W.3d 200 (Tex.Crim.App. 2008)....................................... 25, 49

## Statutes

Art. 35.15(a), V.A.C.C.P. ............................................................................. 52

Art. 35.16(b)(3), V.A.C.C.P. .......................................................................... 58

Art. 35.16(c)(2), V.A.C.C.P. .......................................................................... 58

Art. 37.071(h), V.A.C.C.P. ............................................................................. 5

## Rules

Tex.R.App.Proc. 33.1 ............................................................................. 59, 63

Tex.R.App.Proc. 9.4(e) ................................................................................. 65

Tex.R.App.Proc. 9.4(i)(2)(A) ........................................................................ 65

Tex.R.Evid. 705(b) ............................................................................ 43, 62, 63, 64

NO. AP-77,034

IN THE

COURT OF CRIMINAL APPEALS

AT AUSTIN, TEXAS

| | | |
|---|---|---|
| BRANDON DANIEL | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

APPEAL FROM THE 403RD JUDICIAL DISTRICT COURT

TRAVIS COUNTY, TEXAS

CAUSE NO. D-1-DC-12-201718

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

Now comes the State of Texas and files its brief in response to that of the appellant.

**STATEMENT OF THE CASE**

The State indicted appellant for the capital murder of Austin Police Officer Jaime Padron. (CR 98, 100). The jury found appellant guilty of capital murder as alleged in the indictment. (CR 184). The trial court sentenced appellant to death based on the jury's answers to the punishment issues. (CR 189; RR 26: 221). Appellant timely filed a motion for new trial, which was overruled by operation of

law. (CR 196). Although appeal to this Court is automatic, the appellant timely filed notice of appeal. (CR 197). Art. 37.071(h), V.A.C.C.P.

## STATEMENT REGARDING ORAL ARGUMENT

The issues presented in this case are not issues of first impression but involve the application of facts to well-settled law. Thus, the State does not request oral argument in this case, as it would not significantly aid the Court in the resolution of the issues presented in this appeal.

## STATEMENT OF FACTS FROM GUILT/INNOCENCE

**Facts of this Capital Murder Committed at an Austin Walmart**

In the early hours[1] of April 6, 2012, Walmart employee Sean McCarthy encountered appellant[2] while restocking water in the store. (RR 18: 21). Appellant asked McCarthy to hold his produce bags, and appellant left the store to obtain something. (RR 18: 22-24). Appellant looked "like he had a rough night," but McCarthy did not feel threatened by him. (RR 18: 23). Walmart retail manager Lincoln LeMere called 311[3] because appellant appeared intoxicated, and LeMere feared he would be a danger to himself and others. (RR 18: 54).

---

[1] The time was approximately midnight to 1 a.m. (RR 18: 24).

[2] McCarthy identified appellant in the courtroom. (RR 18: 32-34).

[3] The call was transferred to 911. (RR 18: 54).

Austin Police Officer Jaime Padron responded to the call, and he and LeMere entered the store and encountered appellant. (RR 18: 58-59, 177, 179). Officer Padron announced that he was with the Austin Police Department and told appellant to stop. (RR 18: 59-60, 132). Appellant lowered his shoulder, ducked away from Officer Padron, and ran for the exit. (RR 18: 59). Officer Padron gave chase and tackled appellant from behind. (RR 18: 60). Walmart employee Monica Lawson saw appellant pull a gun from his waistband as Officer Padron attempted to subdue appellant and take his gun. (RR 18: 95-96). As Officer Padron tackled appellant, LeMere heard a gunshot, and he heard an additional gunshot when appellant and Officer Padron fell to the ground. (RR 18: 60-61, 63). Lawson's co-worker, Alma Ramirez, testified that she saw appellant put the gun to Officer Padron's neck and shoot him. (RR 18: 119-120).

LeMere realized appellant had a gun when he saw Officer Padron "bleeding out." (RR 18: 61). LeMere immediately jumped on appellant who raised his arm and fired a third shot, which just missed LeMere's right ear and night manager Archie Jordy's left ear.[4] (RR 18: 61, 133-134). LeMere felt that that third shot was meant for him. (RR 18: 62).

---

[4] Jordy had followed appellant through the store because he suspected he was going to shoplift, but appellant did not appear armed. (RR 18: 56, 129, 153).

LeMere pushed appellant's arm to the ground, and McCarthy and Jordy stomped on appellant's arm, making him release the gun, and kicked the gun aside. (RR 18: 62). Appellant raised his head from the floor, looked at Officer Padron, "kind of laughed, chuckled and said, I killed a cop." (RR 18: 64, 151). Officer Padron never pulled a weapon of any kind when chasing appellant. (RR 18: 98).

It was obvious to the various Walmart employees[5] that Padron was a police officer because of his uniform, "all the gadgets," and his apparent fitness. (RR 18: 38). Officer Padron was wearing a full Austin Police Department uniform. (RR 18: 38, 56). Officer Padron had not removed his gun from his gun belt. (RR 18: 64). The security hood on Officer Padron's holster was still in the locked position with his gun inside the holster. (RR 18: 204-205).

Walmart employees tried to keep Officer Padron alive while police arrived at the scene and handcuffed appellant. (RR 18: 35). Will Garlow removed his shirt and applied pressure to Officer Padron's neck until the squirting blood stopped. (RR 18: 166-167). Garlow talked to Officer Padron and attempted to keep him awake. But, Officer Padron never responded verbally, and he barely focused his eyes. (RR 18: 166, 167-168). Garlow and Austin police officer Chris Kroger attempted to clear Officer Padron's airway, but it was too late, as Officer

---

[5] Walmart employees Monica Lawson, Alma Ramirez, and William Garlow all immediately recognized that Officer Padron was a police officer because of his uniform and badge. (RR 18: 94, 118-119, 162). Austin police officer Steve Martinez was in full uniform during trial and displayed it for the jury since Officer Padron had worn the same type uniform. (RR 18: 217).

8

Padron had bled out. (RR 18: 167, 181). EMS pronounced Officer Padron dead at the scene. (RR 18: 205).

**Evidence Recovered After Appellant Taken into Custody**

Austin police officers removed appellant from the Walmart and searched him for additional weapons. (RR 18: 235). Police found a magazine with six .380 hollow point bullets[6] in appellant's pocket. (RR 19: 34). Homicide Detective Brett Bailey collected the appellant's firearm at the scene.[7] (RR 19: 64). The firearm, a Jimenez Arms .380, still contained the magazine in the grip of the weapon. (RR 19: 65; SX49). The firearm had one live .380 cartridge in the chamber and one in the magazine. (RR 19: 65-66; SX27). Thus, when Detective Bailey found the firearm, it was capable of firing two more rounds. (RR 19: 66). Firearms examination determined that the three casings found at the scene had all been fired from appellant's gun. (RR 20: 145-146).

Police also searched the backpack appellant had with him and found Reese's Peanut Butter ice cream bars, Little Debbie Oatmeal Crème Pies, three bags of peanuts, filet mignon steaks, beef jerky, Hostess CupCakes, and two bottles of

---

[6] Detective Bailey testified that hollow point bullets typically cause more damage upon impact than lead ball ammunition. (RR 19: 62).

[7] State's exhibit 62 reflected appellant purchased this weapon on February 23, 2009, in Fort Collins, Colorado. (RR 20: 60-61). State's exhibit 62 was admitted into evidence without objection. (RR 20: 60).

Korbel Champagne. (RR 18: 235; RR 22: 57). Appellant had killed Officer Padron over $56.90 worth of shoplifted items. (RR 22: 62; SX78).[8]

Upon being taken into custody, appellant asked Austin police officer Albert Arevalo[9] questions regarding the county of the offense, the relative leniency of Travis County versus Williamson County, and if he would get life or death for what he had done. (RR 18: 245). Appellant winked and smiled at Officer Arevalo as he put him in a patrol car. (RR 18: 243). Officer Arevalo noticed that appellant had red, watery eyes and slurred speech and seemed sleepy. (RR 18: 248). Yet, appellant was alert and oriented according to EMS protocol and politely answered questions. (RR 18: 222). Appellant confirmed that he had no injuries or medical problems, although he did have "blow back" blood on his face from Officer Padron's fatal injury. (RR 18: 222; RR 19: 37-38; SX7). Appellant also told EMS technicians that he had not consumed any alcohol or drugs. (RR 18: 222). Appellant asked EMS technician Christopher Lester if he was going to get life in prison for "this." (RR 18: 223). Appellant showed no emotion; he was "very blank, very cold." (RR 18: 224).

---

[8] The evidence of the specific food items and the total coast thereof was admitted at the punishment phase. (RR 22: 57, 62).

[9] Officer Arevalo spelled his name for the court reporter as "Arevalo," but it is recorded in the record as "Arevelo." (RR 18: 238). The State uses the spelling of the name as dictated into the record by the officer.

10

During transport to police headquarters, appellant talked to himself and made a comment about "blasting" one of the officers in the car. (RR 19: 39, 45; SX15). At headquarters, appellant saw an old police department motorcycle that he thought was cool, and he spontaneously admitted "I killed a cop." (RR 18: 248-249; RR 19: 113). Appellant spoke matter of factly, without emotion. (RR 19: 114). Later, when a nurse drew appellant's blood pursuant to a warrant at the Travis County Jail, appellant chuckled, looked at his hands, and said "I guess I got that cop's blood on my hands." (RR 19: 98-99). Appellant, indeed, had blood on his hands. (RR 19: 98).

Appellant waived his Miranda rights and spoke with police. (RR 19: 117-118). The State played appellant's recorded interrogation for the jury. (RR 19: 142; SX59). Appellant appeared cognizant of his actions, used appropriate terminology, and did not present any indication of mental illness or lack of mental fitness. (RR 19: 119). Appellant admitted to have recently taken Xanax, but he did not seem intoxicated. (RR 19: 120). Appellant knew every single detail involving his murder of Officer Padron, including that he held his gun against Officer Padron's skin. (RR 19: 131; RR 20: 57). He knew that he shot an Austin Police Officer, and he admitted numerous times that he was the one who shot Officer Padron. (RR 20: 57).

**Forensic Evidence**

DNA testing confirmed the presence of Officer Padron's DNA profile on appellant's right hand. (RR 20: 84). Forensic testing of appellant's blood showed no alcohol in his blood but revealed a high level of alprazolam (aka Xanax) and marijuana. (RR 20: 89, 93-94, 100). Text messages recovered from appellant's cell phone revealed that on April 4, 2012, appellant arranged for the purchase of eight bars of Xanax and that, the next day, he increased that purchase request to ten bars. (RR 20: 24). Police executed a search warrant on appellant's apartment and discovered sticky notes reading "stop fucking yourself up" and "when I rise to power, you will be sterilized." (RR 20: 29-30, 32).

**Evidence from Officer Padron's Autopsy**

Officer Padron suffered a gunshot wound to his neck, with the entrance wound under the left side of his neck (SX65) and the exit wound in the back right of his neck (SX66). (RR 20: 111). This gunshot travelled through Officer Padron's voice box, fractured his fifth cervical vertebra (neck bone), and damaged two arteries that carried blood to his brain. (RR 20: 113). This gunshot created a large tear in the right common carotid artery and tore apart the vertebral artery.

(RR 20: 113-114). The gunshot injuries to these arteries caused rapid hemorrhaging and were fatal.[10] (RR 20: 116-118).

Black gunpowder soot encircled the entrance wound on Officer Padron's neck, confirming appellant placed the gun against his skin when he fired. (RR 20: 122). The muzzle of the gun actually made contact with Officer Padron's skin, leaving a muzzle imprint. (RR 20: 123). The medical examiner had no doubt that appellant pressed the gun barrel up against Officer Padron's neck when he shot him. (RR 20: 124). The overall path of the bullet was front to back and to the right. (RR 20: 114).

Appellant had also shot Officer Padron in the chest through the right breast pocket of his uniform. (RR 20: 112). But, Officer Padron had been wearing an armored vest so he did not suffer any damage to his body from this gunshot. (RR 20: 112). Firearms examination revealed that the distance of the gun's muzzle to Officer Padron's uniform was less than 14 inches. (RR 20: 149).

**Officer Padron's Personal and Professional Background**

Officer Padron grew up near San Angelo, Texas. (RR 20: 170). After graduating high school in 1989, he joined the Marines and did a tour in Desert Storm, the first Gulf War. (RR 20: 170-171). He received many commendations

---

[10] The medical examiner confirmed that hollow point bullets cause more damage to a person's body than lead filled bullets. (RR 20: 116).

while in the Marines and an honorable discharge. (RR 20: 171). After serving four years in the Marines, Officer Padron became a corrections officer and then a police officer, fulfilling a life-long dream. (RR 20: 172).

Officer Padron was a servant in his church, in his community, and for his country. (RR 20: 172). Officer Padron served 14 years with the City of San Angelo Police Department and became a detective. (RR 20: 173). He also worked with middle school students in San Angelo and had a positive impact on their lives, leading students to become Marines or police officers. (RR 20: 173-174).

Supporting his wife's career choice, Officer Padron moved to Austin with his family. (RR 20: 175). He became a patrol officer with the Austin Police Department, and he was very happy. (RR 20: 175). Officer Padron's brother had offered him a more lucrative job in San Angelo, but Officer Padron declined it because he loved being a police officer and being in Austin with his two young daughters. (RR 20: 176).

At the time of his murder, Officer Padron was planning his life with a new girlfriend. (RR 20: 178). He and his girlfriend were looking for a home with property for horses, which he loved. (RR 20: 178). But, the "world turned to a very ugly place" for the Padron family the day their son and brother was killed. (RR 20: 181). After a funeral in Austin, the family took Officer Padron back home

14

to San Angelo. (RR 20: 181). The City of San Angelo dedicated a park in Officer Padron's honor. (RR 20: 181-182).

**Defense Evidence at Guilt/Innocence**

Jenna Feland dated appellant from July of 2008, till December of 2011, when he ended the relationship. (RR 20: 185). Appellant used drugs while the couple lived in Colorado, mostly using marijuana, but he also did mushrooms, acid, and Ecstasy. (RR 20: 189-190). In fact, appellant took Ecstasy daily. (RR 20: 190).

Feland claimed that appellant did not do well after their break up, and appellant told Feland he was really sad and "in a downward spiral." (RR 20: 12). Appellant started drinking and taking Xanax. (RR 20: 193). Despite the alleged downward spiral, appellant had a new girlfriend, Nikki Nance, that same December, and he and Feland barely had contact prior to this offense. (RR 20: 206, 231-232).

Feland confirmed that appellant did not have a mental illness. (RR 20: 207). By impeaching Feland with her grand jury testimony, the State established that appellant was not generally a depressed person and that Feland was not aware of appellant having mental problems. (RR 20: 228, 234). Feland described appellant as a quiet and reserved person who got depressed when he got in trouble. (RR 20: 234-235).

On cross-examination, the State also established that Feland and appellant discussed him selling his story for $100,000, although she denied it at trial. (RR 20: 200). State's exhibit 71, a videotaped recording of Feland visiting appellant in jail on April 24, 2012, showed appellant had the idea to sell his story of this capital murder, and Feland laughed throughout the video. (RR 20: 214; RR 23: 76). Also, while in jail, appellant created a secret code so that he and Feland could communicate without law enforcement understanding what they had written. (RR 20: 215).

Dr. Matthew Masters, an addiction medicine practitioner, reviewed multiple evidentiary items from the defense in preparation for his trial testimony. (RR 21: 18). Dr. Masters testified that Xanax was a highly addictive drug and the number one benzodiazepine on the street because it was fast-acting. (RR 21: 5, 11-12). Dr. Masters observed appellant on the crime scene video at Walmart, and the manner in which appellant exited his motorcycle was consistent with a person intoxicated by a benzodiazepine. (RR 21: 19). The SWIFS lab report showed appellant had toxic levels of alprazolam in his system seven hours after his arrest, and his toxicity level was consistent with having taken 8 to 10 Xanax pills. (RR 21: 20-21). Thus, Dr. Masters opined that appellant's statement to police the night of the offense was totally unreliable due to confabulation. (RR 21: 23-24). Dr. Masters

16

described appellant as an addict based on his history, his behavior, and his lab reports. (RR 21: 27).

On cross-examination, Dr. Masters confirmed that prior to April 2012 he had not treated appellant or seen him in a professional manner. (RR 21: 33). Dr. Masters conducted only a diagnostic evaluation based on what appellant told him, what the defense provided him, and the grand jury testimony of appellant's new girlfriend. (RR 21: 33). Dr. Masters did not consult any members of appellant's family or a psychiatrist appellant had previously seen[11], and Dr. Masters was not a psychiatrist. (RR 21: 34). Dr. Masters had not seen the crime scene videotape to know that appellant's statement to police was consistent with that tape, thus undermining his opinion that appellant's statement was due to confabulation. (RR 21: 38). Appellant's statement in the police car that he killed a police officer also rebutted Dr. Masters' assessment of confabulation. (RR 21: 38-39).

After approximately one hour of deliberations, the jury found appellant guilty of capital murder as alleged in the indictment. (RR 21: 99, 101).

---

[11] At punishment it was revealed that appellant self-reported that he had seen a psychiatrist in sixth grade, but there was no evidence of the alleged doctor's name or a diagnosis. (RR 24: 155-156).

## STATEMENT OF FACTS FROM PUNISHMENT PHASE

**The Night of this Capital Murder Offense**

Appellant and his roommate Kelvin Davis[12] drank and smoked marijuana the night leading to the murder of Officer Padron. (RR 22: 123). Appellant drank tequila, at least a half a liter of it, and Davis drank rum. (RR 22: 124, 145-146). Appellant also took Xanax; in fact, he took approximately six pills, more than Davis thought appellant could handle. (RR 22: 125). That evening, Davis and appellant walked to a nearby convenience store, and appellant talked about robbing the store. (RR 22: 127-128). Davis tried to downplay appellant's idea to rob the store because appellant didn't need any further legal troubles. (RR 22: 128). Appellant responded that he had gotten "away with worse shit." (RR 22: 128-129).

**Lack of Remorse and Extraneous Bad Acts in Texas**

Officer Cory Knop transported appellant from the Walmart to the Austin Police Department that fateful day. (RR 22: 18). Appellant nonchalantly admitted that he killed a cop. (RR 22: 19). Appellant also asked Officer Knop if he remembered him, which Officer Knop did. Officer Knop met appellant February 2, 2012, when he arrested him for driving while intoxicated. (RR 22: 19-20). Officer Knop conducted field sobriety tests on appellant and transported him to

---

[12] In January of 2012, Davis searched for a roommate in Austin on Craigslist and found appellant. (RR 22: 116).

jail, all of which was videotaped. (RR 22: 21; SX72). During the DWI encounter, appellant volunteered that he had worked multiple times as an informant for the police in Colorado. (RR 22: 27). Appellant asked Officer Knop not to impound his vehicle and if there were anything he could do to help appellant with the charges. (RR 22: 28). Appellant pleaded that he was a productive member of society and not a bad guy. (RR 22: 28-29). Appellant asked Officer Knop if he thought the arrest was right and if he ever felt bad or if he had done the wrong thing. (RR 22: 29-30). Appellant was polite and did not seem threatening to Officer Knop. (RR 22: 22-23). But, appellant was also polite the night he murdered Officer Padron. (RR 22: 23).

About five weeks earlier, on December 27, 2011, DPS Trooper Charles Hoover stopped appellant for speeding on a highway between Amarillo and Lubbock. (RR 22: 167-168). The odor of marijuana from appellant's vehicle was quite strong, and Trooper Hoover found marijuana in appellant's vehicle and arrested him. (RR 22: 169, 171). Trooper Hoover seized from appellant's vehicle a grinder, marijuana pipe, and three pill bottles for prescription marijuana from Colorado that were not in appellant's name. (RR 22: 174-175; SX81, 82). Videotaped evidence from this arrest showed appellant was very compliant with the officer and stated that he wanted to be a productive member of society. (RR 22: 168-169, 173; SX80).

Austin Police Detective Roy Rector was a certified forensics examiner, and he analyzed evidence from two computers seized after appellant's arrest for murdering Officer Padron. (RR 22: 44). Rector retrieved four photographs (SX73-76) from the logical path Users\danielbra\documents\MY BACKUP\JENNA BACKUP\Pictures. (RR 22: 45-48). The file was created May, 26, 2011, but the pictures were taken in March and May of 2009, all by the same camera. (RR 22: 46-47). The pictures (SX 73-76) were of appellant's tattooed arm holding a gun and of a bullet hole in a wall. (RR 22: 45, 47; RR 23: 72; SX83). Nikki Nance had seen appellant's gun approximately ten times; appellant thought having a gun looked "cool." (RR 22: 95-96). Appellant also bragged to Nance that he would drive really fast on his motorcycle and that he had outrun the police in Colorado. (RR 22: 97).

Kristina "Nikki" Nance testified for the State with a testimonial immunity agreement. (RR 22: 87). In late 2011 or early 2012, appellant met Nance through a posting on Craigslist. (RR 22: 89). They used lots of drugs, to-wit: Xanax, cocaine, acid, mushrooms, and Ecstasy, most of which appellant purchased for them. (RR 22: 90-91). As Nance's and appellant's relationship continued, their drug usage increased. (RR 22: 101-102). Appellant began using heavier drugs and mixing them. (RR 22: 102). Nance recalled a time when appellant wanted to find

20

an "eight ball" of cocaine. (RR 22: 92). Appellant tried to get his roommate Davis to do cocaine, but he refused. (RR 22: 119-120).

Nance's and appellant's friendship ended when she fronted him $600 to purchase drugs, and he never paid her back even though he made a lot more money than Nance did and made her late on her rent. (RR 22: 93-94, 95). Appellant once told Davis that he would kill Nikki Nance if she damaged his car. (RR 22: 132). Yet, appellant did not seem psychotic or violent to Davis, even when appellant used drugs. (RR 22: 132-133).

Appellant seemed intelligent to Davis. (RR 22: 132). Appellant never discussed any family issues with his mother or father and never lamented a bad childhood. (RR 22: 133). Appellant told Davis about outrunning the police on his motorcycle. (RR 22: 129).

While in the Del Valle jail after his arrest for this capital murder, appellant met inmate Luis Escalante because Escalante was curious about the jail uniform[13] appellant was wearing. (RR 23: 33). Appellant asked Escalante if he had seen the person on the news who had killed the cop at Walmart. (RR 23: 34). Appellant showed Escalante a picture of himself from the newspaper, and appellant smirked and chuckled about the killing. (RR 23: 35). Escalante asked appellant if he had

---

[13] Escalante explained that persons wearing the orange and white stripes are "high felons," persons who committed aggravated crimes or murders. (RR 23: 33).

any remorse for the killing or sympathy for his victim, and appellant shook his head "no." (RR 23: 36).

Appellant admitted to Escalante that he grabbed Officer Padron by the neck and shot him and that he fired several times. (RR 23: 52-53). Appellant claimed he went to Walmart to get pills "to get his mind right." (RR 23: 53). He had planned to rob the Walmart pharmacy but not harm the police officer. (RR 23: 54). Appellant also told Escalante that Officer Padron told him he was taking him in because he was intoxicated. (RR 23: 54-55).

**Extraneous Bad Acts Committed in Colorado**

On January 25, 2007, Shawn Wycoff of the Colorado State Patrol clocked appellant going 80 m.p.h. in a 55 m.p.h. speed zone on his "highlighter green" motorcycle. (RR 23: 8-9. 11). Wycoff attempted to pull over appellant for speeding, but appellant accelerated and fled, making numerous lane changes and reaching speeds of 90-95 m.p.h. (RR 23: 9, 14). Wycoff radioed another trooper for assistance who was able to stop appellant. (RR 23: 10-11). Appellant presented his driver's license for identification, but he did not have an endorsement allowing him to drive a motorcycle. (RR 23: 11). The trooper arrested appellant for improper endorsement on his license, eluding a police officer, and possession of marijuana, which the trooper found in appellant's pants pocket. (RR 23: 12-13). Appellant admitted that he was out joyriding, racing a friend on the interstate, and

he fled from police because he didn't want to get caught, lose his license, or lose his motorcycle, which was without plates. (RR 23: 12).

In April of 2012, Caresa Marino, a patrol officer in Cheyenne, Wyoming, saw a news report about appellant killing Officer Padron. (RR 23: 19-20). Marino's immediate reaction was "wow, I know that kid. He threatened me in the sixth grade." (RR 23: 20). Marino was not surprised to see appellant on the news. (RR 23: 20).

Marino and appellant attended school together in Parker, Colorado. (RR 23: 21). In November of 1999, appellant threatened Marino when she was playing soccer with her friends at recess. (RR 23: 22, 24). Totally unprovoked, appellant ran up to Marino, told her to lock her doors and windows because he was going to go to her house and rape her. (RR 23: 22). Appellant also called Marino a "bitch" and a "fucker." (RR 23: 22). Appellant and his friends claimed he was just joking, but Marino did not find it funny. (RR 23: 27, 28).

**Extraneous Bad Acts and Disciplinary Violations in Jail**

On May 20, 2012, appellant reported to corrections officer Farial Garrie in the maximum security section of the Del Valle jail that he had found a bunch of green and orange pills in the jail dayroom and that he had taken them in a suicide attempt. (RR 22: 149-151). Appellant was transported to Brackenridge Hospital for the apparent suicide attempt. (RR 23: 74). The physician's summary reflected

23

that appellant claimed to have taken a bag of pills he found taped under a chair. (RR 23: 74; SX84). The records further reflected that appellant decompensated in the emergency room and required intubation and mechanical ventilation. (RR 23: 75). But, appellant's urine and serum drug screens were negative. (RR 23: 75).[14] Furthermore, corrections officers had searched the dayroom before allowing inmates into it, and they had not found any pills. (RR 22: 152-153).

Corrections officers searched appellant's cell thereafter and found a strip of paper with a key to decipher coded messages from appellant. (RR 22: 162-163). Corrections officers found further evidence that appellant intended to bypass jail security by sending the coded paper to his mother through correspondence to his attorney. (RR 22: 163).

In June of 2012, appellant was housed in a psychiatric observation cell in the Del Valle jail. (RR 22: 64). On June 3, 2012, corrections officer Dustin Rade searched appellant's cell for contraband and found hooch, ingredients for an intoxicating beverage, hidden behind the toilet. (RR 22: 65-66). Appellant violated jail rules by possessing the hooch. (RR 22: 67). Officer Rade again found contraband items in appellant's cell on August 17, 2012. (RR 22: 68). Officer Rade found six pills hidden in the window ledge. (RR 22: 68-69). Appellant

_____

[14] During the defense presentation of evidence at the punishment phase, Dr. Harold Scott testified that, from his review of appellant's medical records, he believed appellant took an overdose of Haloperidol, an antipsychotic drug. (RR 25: 168, 173). Haloperidol was the generic version of Haldol, the most common psychological drug in an institutional setting. (RR 25: 168, 173). Dr. Scott testified that the hospital did not screen for Haldol. (RR 25: 172).

24

violated jail rules by possessing the pills, which could only be prescribed by medical staff. (RR 22: 70). Appellant also kept in his cell a list with the jailers' names and their routines and activities. The list of names contained various descriptions of the officers, e.g., appellant said Officer Rade "equals the devil." (RR 22: 81-82).

In October of 2012, Escalante encountered appellant having a secret talk with another inmate, Troy Williams, who was housed across from appellant. (RR 23: 36-37, 67). Appellant and Williams admitted to Escalante that they were planning an escape when appellant was transported for his court hearing in January of 2013. (RR 23: 36-37, 67). Escalante actually overheard them discussing escape plans on two different occasions. (RR 23: 38). Williams explained to Escalante that appellant planned for someone to come to the jail with a gun and start shooting corrections officers. (RR 23: 37, 38). The day before Escalante testified in this trial, he overheard appellant telling another inmate that Escalante was not trustworthy and was a "snitch." (RR 23: 39).

On August 6, 2013, Travis County Sheriff's Deputy Donald MacIntyre heard a commotion and applause coming from the dayroom. (RR 23: 196). He looked into the dayroom and saw appellant taking a bow among the inmates. (RR 23: 196). The inmates had just watched a news story on the television regarding appellant and a court hearing in this capital murder. (RR 23: 196-197). After

appellant took his bow, an inmate yelled "fuck the police," and appellant acknowledged that inmate by raising his fist in the air. (RR 23: 202). A camera in the jail captured this event, and the video of it (SX97) was played for the jury. (RR 23: 204).

**Appellant's Mail and Recorded Phone Conversations in Jail**

Due to the report that appellant planned to overtake a corrections officer to escape, Austin Police Detective David Fugitt realized that he needed to check appellant's phone calls daily for the officers' safety. (RR 23: 83-84). Detective Fugitt listened to approximately 16 hours of appellant's recorded phone conversations. (RR 23: 84). Fugitt also read appellant's mail and emails and watched video of his visitations. (RR 23: 84). Appellant never expressed remorse for killing Officer Padron in any of those communications. (RR 23: 84). His only expression of remorse came during his interrogation, and it was initially in regard to himself. (RR 23: 84).

The State played SX85, a phone conversation between appellant and his mother recorded on April 25, 2012, while appellant was in jail. (RR 23: 76-77). Appellant told his mother that he had been sent to the health services building in the jail for being depressed. (RR 23: 77). But, he disagreed with the depression diagnosis because he was joking about being depressed or committing suicide. (RR 23: 77). Appellant also wrote his sister after a hospital visit. (RR 23: 114;

26

SX91). Appellant wrote that he was put in the hospital after he joked about no sharp objects and called jail officials "stupid." (RR 23: 114).

On March 10, 2013, appellant had another recorded phone conversation with his mother. (RR 23: 79; SX86). In that conversation, appellant gave his mother a code for a secret alphabet so they could bypass security at the jail in regard to their mail. (RR 23: 79). Appellant had drawn an image of an alien utilizing a shading technique where the letters of the alphabet were written inside the image. (RR 23: 79-80). Appellant called his mother again on March 31, 2013, and discussed murderabilia. (RR 23: 81). In another phone conversation with his mother, appellant said an inmate offered him $30 for his artwork, the most money he knew of being offered for artwork. (RR 23: 101). So, appellant made a copy of the artwork to sell "just for the bragging rights." (RR 23: 101-102).

Anthony Angel, with the Travis County Sheriff's Office security threat unit, copied appellant's mail at the request of Detective Fugitt. (RR 23: 106). Appellant primarily wrote letters to his mother, sister, and Feland. (RR 23: 110). His mother set up a pen pal account for him on meet-an-inmate.com, and he asked her to make his profile sound "more bad" because people might be looking for someone "more criminal-ish." (RR 23: 112). Appellant wrote his mother that he was at the top of the prison pecking order in relation to crimes committed. (RR 23: 113; SX90). In letters to Feland, appellant said he did not like being in the general

27

prison population because he didn't particularly get along with inmates or cops because they were "not [his] type of people." (RR 23: 115). Appellant reminded Feland to allow him to run the defense and to not talk to anyone on his legal team because "they [were] only out for themselves." (RR 23: 116; SX93). In another letter, appellant told Feland "not much else going on. Just living the dream. I'm retired at 25." (RR 23: 118; SX95). He added a smiley face. (RR 23: 118).

According to Deputy Angel, coded mail presented security concerns regarding escape plans or attacks on officers or other inmates. (RR 23: 107). Inmates who kept notes on the movements of guards in the jail also presented security concerns regarding escape attempts or assaults on staff. (RR 23: 107).

**Inmate Classification System and Prison "Society"**

Stephen Rogers, a retired warden and corrections officer, testified regarding the prison classification system for inmates. A person sentenced to life without parole was classified as a G3 and was in the general population. (RR 23: 134). A G3 classified inmate had all the privileges[15] of a minimum security G2 inmate except that he could not be housed in a dormitory outside the prison but within the outer fence. (RR 23: 135). The G3 inmate had the same contact with prison staff and volunteers as a G2 and went to chow and walked the hallways without handcuffs. (RR 23: 136). The prison provided food, beds, and television to the

---

[15] These privileges included contact visits and commissary eligibility. (RR 23: 135).

prisoner; radios were available for purchase in the commissary. (RR 23: 190). Prisoners in the general population were allowed to make phone calls, receive emails, and have contact with family members. (RR 23: 160, 191). Yet, prisoners in the general population sometimes attacked, caused serious bodily injury, and/or killed prison guards. (RR 23: 191). On the other hand, a prisoner under a death sentence was classified like an administrative segregation prisoner, i.e., he was confined to his cell 23 hours a day and allowed one hour for recreation. (RR 23: 138).

Rogers discussed the problem with inmates making weapons in prison with some prisoners smart enough to make weapons out of "just about anything[.]" (RR 23: 148-154). And, if a prisoner couldn't make a weapon, he had the opportunity to obtain one from another inmate. (RR 23: 154). And, prisoners had access to dangerous items through prison industry. (RR 23: 155).

Prisoners also found ways to access contraband, with cell phones being the foremost problem.[16] (RR 23: 157). Prisoners often used cell phones to contact their victims or persons who testified against them. (RR 23: 157). Drugs were likewise a problem in the prison system and easier to smuggle than cell phones.

---

[16] One prisoner even managed to access Rogers' Facebook account even though he was in permanent lockup. (RR 23: 157).

(RR 23: 158). Many prisoners were adept at making alcoholic beverages, called hooch or chalk. (RR 23: 158-159).

As a warden, Rogers would have concerns with an inmate who attempted to communicate with people outside of prison through coded mail. (RR 23: 159). Such a prisoner presented a threat to correctional officers, other inmates, and even the public. (RR 23: 160-161). Rogers would also have security concerns about a prisoner who tracked the activities of correctional officers. (RR 23: 161). Prisoners inclined to commit acts of violence would have opportunities to commit acts of violence or kill while in prison. (RR 23: 164). And, prisoners who had animus toward police officers would have opportunities in prison to hurt them. (RR 23: 164).

**Officer Padron's Personal and Professional History**

Officer Padron's older sister, Linda Diaz, testified that Officer Padron enlisted in the Marine Corps when he was just 17 years old and still in high school. (RR 23: 210). After service with the Marines, Officer Padron worked as a corrections officer, first for the Eden Detention Center and then the San Angelo Police Department. (RR 23: 210). Officer Padron moved to Austin and became employed with the airport police and then transferred to the Austin Police Department. (RR 23: 210-211). Killed at age 40, Officer Padron had given more

30

than half his life serving his country and his community and protecting the public. (RR 23: 211).

Diaz described her brother as a very honorable man of integrity and commitment. (RR 23: 211). She described Officer Padron's first act of bravery as a rookie police officer when he twice ran into a burning building to save victims. First, he attempted to save two children, and then he ran back into the house to save a fellow officer who had not emerged from the burning home. (RR 23: 212). Although divorced, Officer Padron was a dedicated father to his two young daughters, aged 6 and 10 at the time of his death. (RR 23: 212). He was even involved in their school because he loved being around children. (RR 23: 213).

While working full-time for the San Angelo Police Department, Officer Padron continued his education, earning degrees in psychology and criminal justice. (RR 23: 213). He graduated with honors. (RR 23: 213). And, Officer Padron had a positive impact on his nieces and nephews. (RR 23: 213). One nephew was following in his footsteps and had enlisted in the Marines. (RR 23: 213).

Officer Padron was "very caring" and "very loving." (RR 23: 214). His daughters missed their "tremendous daddy" time. (RR 23: 214). Officer Padron was also very close to his parents, especially his father who was not in very good health. (RR 23: 214). Officer Padron's parents and siblings attended the trial, and

31

having to hear the testimony was "horrifying" and "almost unbearable." (RR 23: 214). Diaz could see her parents' pain every day and testified that "no parent should have to go through this" and "[h]is little girls shouldn't have to go through their life without their father." (RR 23: 214).

**Defense Evidence at the Punishment Phase**

Travis County corrections officer Richard Low had contact with appellant during his two-year time in the health services building. (RR 24: 10). Deputy Low described appellant as compliant and respectful to him. (RR 24: 11). But, on cross-examination, Deputy Low testified that an inmate was not compliant if he made hooch, hoarded prescription pills, or tracked the movements and activities of corrections officers. (RR 24: 14-15). All those activities were violations of jail regulations, as was sending coded messages to civilian persons through legal mail in the jail. (RR 24: 15). Appellant further violated jail regulations by giving himself a homemade tattoo. (RR 24: 39). Psychological evidence showed appellant was capable of following rules if he so chose, but he did not like to be controlled by other people. (RR 24: 127, 151).

Dr. James Ascough, employed with the USDA, testified via Skype for the defense. (RR 24: 43). He met the appellant through a work-study program when appellant was a student at Colorado State University. (RR 24: 45). Dr. Ascough described appellant as a very good programmer. (RR 24:49). Appellant had Dr.

Ascough had co-authored a chapter in a book entitled *Advances in Nitrogen Management for Water Quality*. (RR 24: 53-54). Appellant worked with Dr. Ascough at the USDA for approximately 18 months, from 2009 to Christmas 2010. (RR 24: 56). Dr. Ascough encouraged appellant to continue working with him and to attend graduate school, but appellant wanted to begin working and earn money. (RR 24: 57-58). Appellant took the job with Hewlett-Packard in Austin, and the two ceased contact in early to mid 2011. (RR 24: 57-58). Dr. Ascough thought appellant was a quiet, hardworking, and respectful "kid," and he was "stunned" when he heard about appellant killing Officer Padron. (RR 24: 59).

Cross-examination revealed that Dr. Ascough actually knew very little about appellant. (RR 24: 66). He did not know that appellant used marijuana and alcohol daily and that he regularly used cocaine, mushrooms, ecstasy, and acid during his college career. (RR 24: 65-66). Dr. Ascough was aware that appellant had a girlfriend, but he didn't know her name. (RR 24: 65). Appellant told Dr. Ascough about his motorcycle, that he liked to go fast, and that he eluded police on it. (RR 24: 67). Appellant was not embarrassed about that. (RR 24: 67).

Dr. William Carter prepared a psychological study on appellant for the defense. (RR 24: 78). Dr. Carter twice interviewed appellant in 2014. (RR 24: 83). In early adolescence, appellant began to emotionally withdraw and about age

33

12 he fell into depression. (RR 24: 88, 91-92). Appellant began to experiment with drugs in middle school to escape his depression. (RR 24: 95-96).

Appellant avoided social contact, and Dr. Carter described him as humorless. (RR 24: 96). As a teenager, appellant felt lonely and isolated.[17] (RR 24: 101). Dr. Carter thought appellant's depression probably worsened into his teenage years, and he felt helpless and suicidal and hated his life. (RR 24: 106). Yet, appellant was not depressed to the point of psychosis. (RR 24: 118). A common theme in appellant's life was his overstatement of his importance by bragging, pushing limits, or letting others know how smart he was. (RR 24: 102).

On cross-examination, Dr. Carter confirmed that the people he interviews have a personal bias to present themselves in a manner in accord with their perceived best interest. (RR 24: 154). Dr. Carter conceded that it was possible appellant claimed he was depressed only after meeting with Dr. Carter and deciding it was to his benefit to be depressed. (RR 24: 162). But, regardless of one's depression level, Dr. Carter confirmed that a person would know not to kill a police officer. (RR 24: 167).

Appellant's report to Dr. Carter of his lack of friends was disputed by his disciplinary records from high school and college. (RR 24: 157-158). The

---

[17] Cross-examination revealed that appellant had had friends with whom he played guitar and rode motorcycles. (RR 24: 157). These friends were apparently so well known that appellant told his mother in letters to use the names of these friends as clues she could insert into his codes. (RR 24: 157).

disciplinary records indicated appellant acted in concert with others in sneaking around the halls or out of classes, of using drugs behind Hobby Lobby with his motorcycle-riding friends, and for showing affection on campus to a girl. (RR 24: 157-158). Appellant's disciplinary records also reflected assaultive conduct by him. (RR 24: 159). In one incident, appellant "sucker punched" another boy in the locker room. (RR 24: 159). The person writing the report was concerned because appellant showed no remorse for the assault. (RR 24: 159).

Dr. Carter admitted in cross-examination that appellant displayed manipulative and controlling behaviors before and after this capital offense. (RR 24: 162-163). Appellant used Nikki Nance to get drugs, and he told Jenna Feland to not talk to anyone about him, including his lawyers, mitigator, private eye, etc. until he told her to. (RR 24: 162-164; SX93).

Appellant told Dr. Carter that he went to the Walmart to steal[18] and he took his gun with him "just in case." (RR 24: 167). Appellant knew he shot a police officer, and, by the extent of the injury, he knew the officer was dead. (RR 24: 169). Dr. Carter admitted that appellant lacked empathy. (RR 24: 164). The fact that appellant planned to profit from this capital murder was disturbing to one of his psychologists. (RR 25: 132).

---

[18] Evidence showed appellant had recently received a promotion at work and earned approximately $65,000 to $70,000 at his job. (RR 24: 180).

The defense also presented Dr. Walter Harrell, a psychologist specializing in neuropsychology and rehabilitation psychology. (RR 24: 222). Based on appellant's *self-reporte*d frontal lobe injuries,[19] Dr. Harrell thought appellant had been struggling with depression and sadness his whole life. (RR 24: 249, 254). Dr. Harrell opined that appellant's multiple concussive events[20] predisposed him to have struggles with depression, suicidal idealization, and substance abuse. (RR 25:98). Dr. Harrell claimed appellant had a substance abuse disorder that had been evident since third grade. (RR 24: 255). This testimony, however, was also based on appellant's self-report that he began drinking alcohol and smoking marijuana in third grade; appellant also claimed he did cocaine with his father. (RR 24: 256).

Even Dr. Harrell reported that appellant showed a complete lack of remorse for killing Officer Padron.[21] (RR 25: 131-132). Appellant told Dr. Harrell that he went to Walmart to steal groceries, that he carried a gun, was pursued by an

---

[19] One such injury resulted from a skateboarding accident when appellant was 14 years old, but appellant's brain scan following this accident was normal. (RR 25: 79).

[20] On cross-examination, Dr. Harrell acknowledged that appellant was very intelligent, and he had no difficulty communicating with him. (RR 25:82-83). He also had to acknowledge that his assessment of appellant's frontal lobe injuries was merely an inference based on unsubstantiated reports of head injuries from appellant. (RR 25: 85-87). In one such report, appellant told Dr. Harrell of a head injury he sustained when he was 18 months old. Dr. Harrell admitted that at such a young age, appellant would not have an independent recollection of that event. (RR 25: 85-87).

[21] Appellant's aunt, who was the County Attorney for Pottawatomie County, Kansas, testified that appellant had never expressed remorse for killing Officer Padron. (RR 25: 22, 60).

36

officer, and shot him. (RR 25: 102). Dr. Harrell testified that appellant struggled with impulse control all of his life. (RR 25: 104). But, he thought appellant's killing of Officer Padron was a drug-related problem. (RR 25: 105). Appellant could become dangerous and commit acts of violence in prison if he was under the influence of alcohol or drugs. (RR 25: 111).

Dr. Harrell further confirmed on cross-examination that no mitigating factors of sexual abuse, physical abuse, mental retardation, homelessness, or lack of food were present in this case. (RR 25: 128-129). Even though appellant committed various offenses as a juvenile, he never did time in the juvenile system. (RR 25: 130). Appellant was highly intelligent, had excelled in school, and had even graduated Colorado State University with honors in a highly technical field. (RR 25: 129). At the time of this offense, appellant had a good job with a national company and had no work-related issues. (RR 25: 129-130).

Psychiatrist Dr. Harold Scott diagnosed appellant with depressive and addictive problems. (RR 25: 180). Dr. Scott testified appellant was highly addictive, having used substances since age nine to "obliterate reality" and self-medicate for his depression. (RR 25: 208-209). Appellant used alcohol, cough syrup, marijuana, and computer duster (an inhalant) by age thirteen. (RR 25: 208-209).

37

On August 26, 2012, corrections officer Stephen Crim found appellant on top of his bunk with his hands in the air vent. (RR 24: 199-200). Crim searched appellant's cell and found torn bedsheets fastened into a noose and a three-foot long rope. (RR 24: 201). The noose was in the air vent. (RR 24: 201). Just expressing suicidal feelings would get an inmate transferred to the health services building in jail. (RR 24: 40). On another occasion, an inmate reported to Crim that he overheard appellant and another inmate discussing escape plans because they were tired of being in jail and wanted out. (RR 24: 203). The fellow inmate planned to overtake a guard, get his keys, and let appellant out of his cell. (RR 24: 203).

**State's Rebuttal Evidence at Punishment**

In appellant's phone calls, letters, and visitation, he showed a fascination with major criminal events that had occurred since this capital murder. (RR 25: 248). He often spoke of the Aurora, Colorado, movie theater shooting, the Sandy Hook Elementary School shooting, the Boston Marathon bombing, and the DC capital police shooting. (RR 25: 248-249). Appellant was intrigued with the number of casualties and the type of weapons used. (RR 25: 249). His mother once commented that she felt sorry for the shooter in the movie theater massacre in Colorado. (RR 25: 249).

Dr. Marisa Mauro, a licensed psychologist, interviewed appellant on February 17, 2014, regarding his depression, family, substance abuse before, during, and after this offense, prognosis for recovery from depression and substance abuse, and his adjustment to incarceration. (RR 26: 13-15). Appellant provided Dr. Mauro with little information and was very emotionless. (RR 26: 16). Dr. Mauro found no evidence of psychoses, and she disagreed with the diagnosis of major depression, severe and recurrent. (RR 26: 17). Dr. Mauro opined that appellant's alleged suicide attempt (the taking of the pills while in jail) was more of a gesture, and the circumstances of that event raised questions for her regarding appellant's intent of taking the pills. (RR 26: 20). After his break up with Feland, appellant threatened to kill himself with his gun but that was only a ruse to get her back. (RR 26: 24-25).

Dr. Mauro did not believe that depression impacted appellant before, during or after this capital offense. (RR 26: 31). Records also indicated that appellant said he made the nooses to "mess with" the jail psychiatrist and to get a cell change to a cell with a window where he could get radio reception. (RR 26: 69). Appellant displayed shockingly little difficulty adjusting to jail. (RR 26: 19). He socialized with other inmates, engaged in daily activities with them, and even called them "friends." (RR 26: 25-26, 36).

39

Appellant told Dr. Mauro that he had a "pretty normal" childhood with difficult issues being his parents' divorce, few friends, and a sometimes emotionally abusive mother. (RR 26:22-23). He reported to Dr. Mauro substantial more drug use than documented in his records. (RR 26: 28). Appellant reported abusing substances daily and using every classification of drug, from prescription pills to opium, methadone, street drugs, Ecstasy, Xanax and alcohol. (RR 26: 28). Despite appellant's dependency on drugs and alcohol, he did not experience withdrawal symptoms while in jail. (RR 26: 29). Dr. Mauro knew from her work in prison systems that inmates had access to narcotics "pretty much all the time" and alcohol. (RR 26: 70). Dr. Mauro testified that psychiatric medications were valuable in prison and used for favors. (RR 26: 70).

Dr. Mauro used a psychopathy checklist to measure future dangerousness, but she did not use that tool in this case. (RR 26: 37). The psychopathy checklist defined asocial behaviors or not conforming to laws, violating the rights of others, having restricted or shallow ranged of affect and a lack of empathy, and being conning and manipulative. (RR 26: 37).

**The Verdict at the Punishment Phase**

The jury found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence and constitute a continuing threat to society. (RR 26: 216). The jury also found that there were not sufficient

40

mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. (RR 26: 216). Appellant requested a jury poll, which revealed the jury's answers to the punishment verdict were unanimous. (RR 26: 217-218). In accordance with the jury's verdict, the trial judge sentenced appellant to death by lethal injection. (RR 26: 221).

## SUMMARY OF THE ARGUMENTS

**State's Reply to Appellant's First Point of Error**: Any rational jury could have found beyond a reasonable doubt that there was a probability that the appellant would commit criminal acts of violence constituting a continuing threat to society. The direct evidence of this capital murder and the circumstances surrounding it were highly probative of appellant's propensity for future dangerousness. He entered the Walmart armed with a loaded firearm and magazine, clearly intending violence. When appellant's first shot at Officer Padron did not injure him, appellant placed the muzzle of the gun against Officer Padron's neck, fired, and killed him. Appellant also fired at the heads of Walmart employees who detained him.

Furthermore, appellant never showed remorse for committing this capital murder. Instead, he was boastful and cavalier. Appellant gained self-worth from committing this offense and other criminal acts. He showed a life-long disrespect for law enforcement and others. He continually committed violations while in jail

41

and planned a violent escape.  Appellant's escalating drug use and abuse was considered a factor in his commission of this capital murder, and appellant's drug use, which made him dangerous, continued while he was incarcerated.

The evidence in this case showed that prior to and after committing the capital murder of Officer Padron appellant engaged in conduct that constituted a threat to society.  The evidence was therefore legally sufficient to sustain the jury's verdict at punishment.

**State's Reply to Appellant's Second Point of Error**:  Appellant's second point of error should be overruled because appellant did not suffer any harm from the trial court's denial of his challenge for cause to venireperson Reading.  The record reflects that appellant utilized only 14 peremptory challenges in selecting the 12 members of the jury.   Appellant utilized his fifteenth peremptory challenge to strike a venireperson in the pool of alternates.  Appellant did not request an additional peremptory strike because he did not need one.  He also did not identify an objectionable juror who sat on his jury.  Under these circumstances, appellant failed to show he suffered any harm.

Alternatively, the trial judge did not err in denying appellant's challenge for cause to venireperson Reading.  The entirety of Reading's voir dire revealed that he could follow the law, hold the State to its burden of proof at both phases of trial, and consider mitigating evidence.  Although Reading viewed the death penalty as

42

an appropriate punishment for certain murders, his voir dire reflects that he would not automatically assess it. The record is sufficient to sustain the trial judge's ruling on appellant's challenge for cause to Reading. Appellant's second point of error should be overruled on the merits as well.

**State's Reply to Appellant's Third Point of Error**: Appellant failed to preserve any alleged error for review. Appellant requested a hearing on Dr. Mauro's qualifications, and the trial judge granted that request. Appellant requested to explore the basis of Dr. Mauro's findings, and the trial judge allowed that inquiry. There being no adverse rulings, appellant failed to preserve any alleged error for review. Moreover, appellant had no objection to Dr. Mauro's testimony at trial.

Additionally, the trial judge afforded appellant a proper hearing under Rule 705(b). By its express terms, Rule 705(b) does not authorize inquiry into the expert's specific findings. It allows inquiry into the underlying basis of the expert's opinion, which the trial judge allowed in this case. The record reflects that the trial judge complied with the requisites of Rule 705(b), and appellant fails to show any alleged error.

Appellant's third point of error is wholly without merit and should be overruled.

## STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR

**The evidence was legally sufficient to establish that there is a probability that appellant would commit criminal acts of violence and constitute a continuing threat to society.**

**Standard and Scope of Review**

When reviewing the future-dangerousness special issue, the appellate court views the evidence in the light most favorable to the jury's finding and determines whether a rational jury could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence constituting a continuing threat to society. *Soliz v. State*, 432 S.W.3d 895, 901 (Tex.Crim.App. 2014). In this context, "society" includes both the free world and prison society. *Id.*, citing *Druery v. State*, 225 S.W.3d 491, 507 (Tex.Crim.App. 2007). The Court's review is a very limited one. *Chambers v. State*, 903 S.W.2d 21, 25 (Tex.Crim.App. 1995). The Court's task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict and to determine whether, based on that evidence and those inferences, a rational jury could have found beyond a reasonable doubt the elements of the special issue. *Id.*

The circumstances surrounding the offense, if severe enough, may alone be sufficient to support an affirmative answer to the future dangerousness special issue. *Freeman v. State*, 340 S.W.3d 717, 725 (Tex.Crim.App. 2011). Prior

unadjudicated acts of violence against people and property, prior adjudicated criminal acts, and habitual drug abuse all constitute evidence of future dangerousness. *Soliz*, 432 S.W.3d at 901, citing *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex.Crim.App.), *cert.denied*, 513 U.S. 1060 (1994). Some factors a jury may consider when determining whether a defendant will pose a continuing threat to society include the following:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the severity of the prior criminal acts committed by the defendant;
5. the defendant's age and personal circumstances at the time of the commission of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and
8. character evidence.

*Devoe v. State*, 354 S.W.3d 457, 461-62 (Tex.Crim.App. 2011). This list is not exclusive. *Id.* at 462. Further, the circumstances of the offense and the events surrounding it can be among the most revealing evidence of future dangerousness. *Bell v. State*, 938 S.W.2d 35, 41 (Tex.Crim.App. 1996), *cert.denied*, 522 U.S. 827 (1997).

**Application of Law to Facts**

The direct evidence of this capital offense and the circumstances surrounding it were highly probative evidence of appellant's future dangerousness.

Appellant's actions exhibited foresight and planning. Appellant entered the Walmart armed with a loaded weapon and with the intent to shoplift. He took the loaded weapon "just in case," clearly anticipating using violence against anyone who interfered with his criminal endeavor. Appellant loaded the firearm with hollow point bullets to cause maximum damage to his victim(s). Along with the loaded firearm, appellant carried a magazine loaded with additional hollow point bullets, indicating his willingness to shoot and possibly kill multiple victims.

Appellant, in fact, fired his weapon multiple times. His first shot hit Officer Padron in his uniform pocket but did not injure Officer Padron because of his protective vest. Appellant then knowingly placed the gun against Officer Padron's neck and fired again, killing him. As Walmart employees tried to subdue appellant, he fired again, almost shooting both LeMere and Jordy in their heads. Appellant killed Officer Padron and attempted to kill Walmart employees over a mere $56.90 of shoplifted groceries. (SX78).

The jury could further infer appellant's propensity for future dangerousness from evidence showing a lack of remorse. *Estrada v. State*, 313 S.W.3d 274, 285 (Tex.Crim.App. 2010). Appellant never expressed or showed remorse for committing this capital murder, and he had no sympathy for his victim. Rather, he was repeatedly cavalier and boastful. Appellant laughed after killing Officer Padron and smiled and winked at arresting officers. In jail, appellant enjoyed

sharing news stories about his capital murder with fellow inmates, took a bow in response to their applause, and pumped his fist in response to a disparaging remark regarding the police. Even appellant's own witnesses[22] testified he never expressed remorse for this capital murder.

Appellant's propensity for future dangerousness was supported by evidence of his long-term disrespect for law enforcement. While in jail, appellant tracked the activities and movements of corrections officers in preparation for a violent escape from jail, which involved shooting law enforcement officers. He committed repeated violations of jail regulations and created a code to bypass jail security with his mail. Evidence established that inmates who communicated via coded mail presented a security threat to corrections officers, other inmates, and even the public. In just the four months preceding this capital murder, appellant continually committed criminal offenses, including traffic violations, possession of marijuana and other controlled substances, possession of drug paraphernalia, DWI, and excessive drug usage. *Barley v. State*, 906 S.W.2d 27, 30-31 (Tex.Crim.App. 1995) (explaining that even a criminal history comprised offenses that are not overtly violent can lead a reasonable juror to find a probability of future dangerousness when the offenses show an escalating and ongoing pattern of disrespect and continued violations of law).

---

[22] His aunt and hired psychologist Dr. Harrell.

Some of the most disturbing evidence of appellant's future dangerousness was that he gained his self-worth from his criminal activity, in spite of being highly intelligent and having had a well-paying job. Appellant told his mother that he was at the top of the prison pecking order. The night of this capital murder, appellant wanted to commit a robbery, telling his roommate that he had gotten away with "worse shit." Appellant saw this capital murder as an opportunity for financial gain by selling his story, which even his defense expert found disturbing. He asked his mother about murderabilia and to post him on meet-an-inmate.com, describing him as "bad" as possible. Appellant thought he was "cool" for owning a firearm, and he bragged about eluding police on his motorcycle. And, appellant exhibited a character for violence. He was obsessed with mass murder and other violent tragedies such as the movie theater massacre in Colorado, the Sandy Hook Elementary murders, and the Boston Marathon bombing.

Appellant further displayed a lack of respect for others, even his friends. He was manipulative, using Nikki Nance for drugs and money, despite his high-paying job. Appellant threatened to commit suicide with his firearm as a ruse to get Feland back as his girlfriend. He was polite with police officers and pleaded that he wanted to be a "productive member of society" to get out of tickets or arrests. He feigned suicide attempts while incarcerated to get better housing.

48

The substantial psychiatric evidence in this case supported the jury's determination that appellant constituted a continuing threat to society. Appellant did not like to be controlled by others and lacked empathy. He had the capacity to change, but chose not to. Appellant's mental health experts diagnosed appellant with major depression, but also considered his depression a factor in his commission of crime. The jury could infer from the evidence regarding his personality that his character traits were consistent with the factors on the psychopathy checklist for future dangerousness.

The jury could reasonably believe that appellant's drug use made him dangerous. *Williams v. State*, 273 S.W.3d 200, 214 (Tex.Crim.App. 2008); *Wilkerson*, 881 S.W.2d at 326, (habitual drug use constitutes evidence of future dangerousness). Although intoxicated on Xanax the night he committed capital murder, appellant planned his criminal activities at Walmart, went to the store intending to steal from the pharmacy, armed himself with a loaded firearm and magazine, and was fully aware that he had murdered a police officer. Defense witness Dr. Harrell thought appellant's killing of Officer Padron was a drug-related problem, and he testified that appellant could become dangerous and commit acts of violence in prison if he were under the influence of drugs or alcohol. The State presented evidence that prison inmates had regular access to drugs and alcohol. And, there was evidence that psychiatric medications were valuable in prison and

could be used for favors. Despite appellant's escalating drug use prior to this capital murder, he did not experience withdrawal symptoms in jail, suggesting he continued to abuse substances. Indeed, appellant made "hooch" while incarcerated and hoarded pills in his cell.

Appellant contends the evidence in this case is insufficient like the evidence in *Berry*, *Beltran*, and *Huffman*.[23] Appellant's brief at p. 17. But, these cases are easily distinguishable on their facts. In *Berry*, the evidence showed the defendant was dangerous "only to those of her own children" and there was a very low probability that she would have any more children if sentenced to life in prison. 233 S.W.3d at 864. Additionally, the State in that case invited the jury to utilize an improper standard in its consideration of future dangerousness by asking the jury to assume that the defendant would be living in the free world. *Id.* at 863.[24] In *Beltran*, the Court determined the facts of that robbery-murder alone were insufficient to sustain the future dangerousness issue, and Beltran's prior criminal history reflected mostly alcohol-related offenses. 728 S.W.2d 389-90. Unlike appellant's case, no psychiatric evidence was introduced in *Beltran*. 728 S.W.2d at 390. In *Huffman*, there was no evidence that the defendant originally intended

---

[23] *Berry v. State*, 233 S.W.3d 847 (Tex.Crim.App. 2007), *Beltran v. State*, 728 S.W.2d 382 (Tex.Crim.App. 1987), and *Huffman v. State*, 746 S.W.2d 212 (Tex.Crim.App. 1988).

[24] Also, it is notable that *Berry* was a 5-4 decision with the dissent arguing that the majority utilized an improper standard of review on the future dangerousness sufficiency question. 233 S.W.3d at 865.

murder or violence in committing the robbery-murder. 746 S.W.2d at 225. Huffman committed the offense while highly intoxicated and had no memory of it. He had only one disciplinary violation while incarcerated and that was shortly after his arrest because he did not know where he was or why he was there. *Id.* at 224. And, the State presented no psychiatric evidence at punishment. *Id.* at 225.

The evidence in this case showed that prior to committing this capital murder appellant continually engaged in conduct that constituted a threat to society. The killing of Officer Padron was the culmination of a life-long escalating pattern of violations of the law, disrespect for law enforcement officers and other citizens, including friends, escalating drug use and abuse, threatened violence, and depression. The evidence at trial showed appellant continued to engage in such behaviors even after being incarcerated for this capital murder. Based on all the evidence, the jury's finding that there was a probability that appellant would commit criminal acts of violence and constitute a continuing threat to society was rational. The evidence was therefore legally sufficient to sustain the jury's answer on the punishment issue. Appellant's first point of error should be overruled.

## STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR

**Appellant did not suffer harm as a result of the trial court's denial of his challenge for cause to venireperson Reading. Alternatively, the trial judge did not err in denying appellant's challenge for cause to venireperson Reading.**

The issue is whether the trial court's ruling on appellant's challenge for cause to Reading effectively deprived appellant of one of his statutorily-given peremptory challenges. *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex.Crim.App. 2011). Before harm can be shown on the record with respect to a trial court's denial of a defense challenge for cause, a defendant must (1) use a peremptory strike on the challenged prospective juror; (2) exhaust his peremptory challenges; and (3) request an additional peremptory strike to use upon a specifically identified objectionable venire member who, because the extra strike was denied, actually sat on the jury. *Davis v. State*, 313 S.W.3d 317, 343 (Tex.Crim.App. 2010). In a death penalty case with only one defendant, that defendant is entitled to fifteen peremptory challenges. Art. 35.15(a), V.A.C.C.P.

**Appellant Cannot Show Harm**

The State had no objections to Reading as a juror. (RR 11: 205). Appellant objected to Reading on the basis that he had a bias toward the death penalty and that he would require the defense to present mitigating evidence. (RR 11: 205). The trial judge denied appellant's challenge to Reading, and appellant exercised a peremptory challenge against Reading. (RR 11: 205; RR 16: 123-124). The

defense utilized only 14 peremptory challenges in selecting the 12 members of the jury. (RR 16: 132). The defense used its fifteenth peremptory challenge to strike a venireperson from the pool of alternate jurors. (RR 11: 134). *Cf. Comeaux v. State*, 445 S.W.3d 745, 751 (Tex.Crim.App. 2014) (defendant who chooses to use peremptory strike outside strike zone may not complain about harm concerning juror within strike zone who could have been removed instead).

Appellant did not request an additional peremptory strike because it was not needed. (RR 11: 133-134). Consequently, appellant did not identify an objectionable juror on his jury because none sat on his jury. And, appellant did not claim that he would have struck an alleged objectionable juror if he had had an additional peremptory strike to use. Under these circumstances, appellant fails to show he suffered any harm from the trial court's denial of his challenge for cause. *Comeaux*, 445 S.W.3d at 750. Appellant's second point of error should be overruled on this basis.

## Alternatively, the Trial Judge Did Not Err in Denying the Challenge for Cause

Although recognizing that he cannot show harm because he did not use all of his peremptory challenges, appellant's brief at pp. 18-19, appellant nevertheless contends that the trial judge erred in denying his challenge for cause to venireperson Reading. Appellant contends Reading was challengeable for cause

for his bias in favor of the death penalty and for his need for the defense to present mitigating evidence.

**Facts Relevant to the Challenge for Cause**

During the State's voir dire examination, Reading indicated that his views regarding the death penalty would not affect his ability to listen to the evidence and the law in this case as given by the trial judge and to decide the punishment issues. (RR 11: 166). As for murder, Reading affirmatively noted that he could consider the entire range of punishment, and he, in fact, could envision situations where the minimum and maximum punishments would be appropriate. (RR 11: 168). Reading agreed with the prosecution that murder by itself was never sufficient for the death penalty. (RR 11: 170). Reading believed capital punishment was appropriate for the capital murder of a police officer. (RR 11: 171).

Reading further understood that there were only two punishment options in a capital murder case, and he was okay with that. (RR 11: 171-172). Reading could "absolutely" hold the State to its burden of proof of beyond a reasonable doubt and not put any burden on the defense. (RR 11: 172). Reading understood, and agreed, that he should find the defendant "not guilty" if the State failed in its burden of proof and even if the defendant presented no evidence. (RR 11: 173).

Reading had a basic understanding of the punishment phase process in a capital murder case regarding the special issues. (RR 11: 173-174). The

prosecutor discussed the factors in the first punishment issue, viz: probability, criminal acts of violence, and society. (RR 11: 175-179). The record reflects Reading understood the issues related to those factors, the State's continued burden of proof on those issues, and that the defendant did not have to do anything. (RR 11: 175-176).

As for the mitigation issue, Reading indicated he was open to considering that there could be mitigating evidence sufficient to choose life without parole as an appropriate punishment. (RR 11: 181). On the second punishment issue, Reading could consider any mitigating evidence presented, the circumstances of the offense, the defendant's character and background, and the defendant's moral culpability. (RR 11: 183-186). The prosecutor also discussed other potential mitigating factors with Reading. (RR 11: 186-188). Reading was willing to wait and hear all the evidence before making any decision about the punishment issues. (RR 11: 188).

The defense then questioned Reading. In response to a hypothetical regarding a capital murder of a police officer, Reading stated he would lean toward the death penalty as an appropriate punishment where there were no defensive issues at guilt/innocence and where the jury has already determined the future dangerousness issue against the defendant. (RR 11: 190). Yet, Reading confirmed that he could consider mitigating evidence. (RR 11: 191). When asked by defense

counsel if he would want the defense to bring evidence to convince him that death was not the appropriate punishment, Reading answered affirmatively. (RR 11: 191).

Further, regarding mental illness as mitigating evidence, Reading indicated that killing a police officer was a serious offense and that it would be difficult to not vote for the death penalty where such a murder was knowingly committed. (RR 11: 193). When asked by defense counsel to place himself on a spectrum of the death penalty being reserved for the "worst of the worst" to being appropriate for any murder, Reading tended to fall more toward believing the death penalty was appropriate for any knowing and intentional murder. (RR 11: 196-197).

Reading confirmed that he could "absolutely" fairly and impartially consider all the evidence in this case, even in the punishment phase. (RR 11: 197). Reading clarified that he would not automatically lean toward the death penalty after finding a person guilty of the capital murder of a police officer, as suggested by defense counsel's hypothetical, which had confused Reading. (RR 11: 197-198). After again discussing the defense hypothetical, Reading confirmed that he would lean toward the death penalty as the appropriate punishment where several factors were present, to-wit: the defendant intentionally killed a police officer in the line of duty, there were no defensive issues and no mental illness issues, and the jury

had already found that the defendant would constitute a continuing threat to society. (RR 11: 199).

Finally, as to the Fifth Amendment right not to testify, Reading indicated that he would not hold it against the defendant if he did not testify, but it would be a question in his mind; i.e., why not testify and defend yourself if you are innocent.[25] (RR 11: 200). But, Reading indicated that he would do his best to put that out of his mind if instructed by the trial judge to not consider it during deliberations. (RR 11: 200-201). Reading confirmed for the trial judge, after having the instruction read to him, that he could follow the court's instruction. (RR 11: 201-202).

The trial judge then questioned Reading. The judge determined that Reading could "absolutely" consider the mitigation issue after finding that the defendant would be a continuing threat to society. (RR 11: 202-203). The judge in fact noted that the jury only considered the second punishment issue if it had found the first punishment in the affirmative, i.e. that the defendant would be a continuing threat to society. (RR 11: 202). Reading confirmed that he could consider mitigating evidence and vote for a sentence less than death if warranted by the mitigating circumstances. (RR 11: 203).

---

[25] Appellant does not contend on appeal that Reading was challengeable for cause on this basis. And, indeed he was not, given that he confirmed he could follow the law. (RR 11: 201-202).

The State had no objections to Reading as a juror. (RR 11: 205). Appellant objected to Reading on the basis that he had a bias toward the death penalty and that he would require the defense to present mitigating evidence. (RR 11: 205). The trial judge denied appellant's challenge to Reading, and appellant exercised a peremptory challenge against Reading. (RR 11: 205; RR 16: 123-124).

**Standard of Review and Applicable Law**

The appellate court looks at the entire record of voir dire to determine if the evidence is sufficient to support the court's ruling on a challenge for cause. *Gonzales*, 353 S.W.3d at 831. The appellate court affords great deference to the trial court's ruling because the trial judge is present to observe the demeanor of the venireperson and to listen to his tone of voice. *Id.*, citing *Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App. 2002). Particular deference is afforded when the venireperson's answers are vacillating, unclear, or contradictory. *Davis*, 313 S.W.3d at 344. The appellate court will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Gonzales*, 353 S.W.3d at 831, citing *Davis*, 313 S.W.3d at 344.

A venireperson is subject to a challenge for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. Art. 35.16(b)(3), (c)(2), V.A.C.C.P.; *Gardner v. State*, 306 S.W.3d 274, 295 (Tex.Crim.App. 2009). The test is whether a

58

venireperson's bias or prejudice would substantially impair his "ability to carry out his oath and instructions in accordance with the law." *Gonzales*, 353 S.W.3d at 831-32, quoting *Feldman*, 71 S.W.3d at 744. The proponent of the challenge for cause must establish that the challenge was proper by showing that the venireperson understood the requirements of the law and could not sufficiently overcome his prejudice to follow the law. *Gonzales*, 353 S.W.3d at 832. Before a venireperson may be excused for cause on that basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Feldman*, 71 S.W.3d at 744.

**Application of Law to Facts**

Viewing the entirety of Reading's voir dire examination, it is clear that the trial court did not abuse its discretion in denying appellant's challenge for cause to Reading. Reading did not display a determination to automatically vote for the death penalty, as appellant contends.[26] Appellant errs in relying on only a portion of Reading's voir dire to support his argument.

Reading agreed that capital punishment was an appropriate punishment for the intentional murder of a police officer, but he repeatedly confirmed that he

---

[26] Appellant also argues in his brief that because Reading had a bias toward the death penalty, he lowered the State's burden of proof. Appellant's brief at p. 21. Appellant did not make this argument regarding the burden of proof in the trial court, so that argument is not preserved for appellate review. Tex.R.App.Proc. 33.1. Moreover, Reading steadfastly maintained that he would hold the State to its burden of proof. *See* (RR 11: 172-173, 175-176).

could hold the State to its burden of proof on the punishment issues, consider any mitigating evidence, and follow the court's instructions. While, in one point of his voir dire, Reading stated that he would vote for the death penalty for the knowing murder of a police officer, that answer was in response to a hypothetical that confused Reading. *See* (RR 11: 197-198). After again discussing the defense hypothetical, Reading confirmed that he would lean toward the death penalty as the appropriate punishment where several factors were present, viz: the defendant intentionally killed a police officer in the line of duty, there were no defensive issues and no mental illness issues, and the jury had already found that the defendant would constitute a continuing threat to society. (RR 11: 199). But, as his voir dire indicates, he would only "lean" toward the death penalty; it was not an "automatic" assessment of death. Reading's voir dire reflected that he deemed capital murder an "appropriate" punishment, not an "automatic" punishment.

Furthermore, Reading's voir dire reflects that he understood and fully accepted the State's burden of proof at guilt/innocence and on the punishment issues. Reading confirmed he could "absolutely" hold the State to its burden of proof of beyond a reasonable doubt and not put any burden on the defense. (RR 11: 172). Reading understood, and agreed, that he should find the defendant "not guilty" if the State failed in its burden of proof, even if the defendant presented no evidence. (RR 11: 172-173). As for the factors relevant to the first punishment

60

issue, Reading understood the State's continued burden of proof on those issues and that the defendant had no burden with regard to that issue. (RR 11: 175-176).

The State acknowledges that Reading answered affirmatively in response to defense counsel's question "you would want the Defense to bring you -- bring you some evidence to convince you that death is not the appropriate sentence, correct?" (RR 11: 191). Yet, this was an isolated portion of Reading's voir dire, and defense counsel had not explained the burden of proof to Reading prior to this question; nor had the defense asked Reading whether he could follow the law once properly explained to him. *Gonzales*, 353 S.W.3d at 832; *Feldman*, 71 S.W.3d at 744. Thus, Reading was not challengeable for cause based on that single response.

Appellant's second point of error is without merit and should be overruled.

## STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR

**Appellant failed to preserve any alleged error for review because there was no adverse ruling. Alternatively, the trial court did not abuse its discretion in limiting the voir dire hearing to the expert's qualifications and the basis of her findings.**

**Relevant Facts**

Prior to Dr. Mauro testifying for the State in rebuttal at the punishment phase, appellant requested and was granted a hearing on her qualifications. (RR 26: 6). The State questioned Dr. Mauro about her educational and professional background. (RR 26: 6-8). Then, on his voir dire examination, appellant asked Dr.

61

Mauro to summarize her findings regarding him. (RR 26: 8). The trial judge interjected that the voir dire was to be on Dr. Mauro's qualifications, and appellant agreed. (RR 26: 8-9). Appellant stated that he might want to suppress some of Dr. Mauro's findings, and he contended he had a right to question the scientific basis for her findings. (RR 26: 9). The trial judge confirmed that appellant had the right to question Dr. Mauro about the basis of her findings and her expertise, but he did not have the right to a hearing as to her specific findings. (RR 26: 9). Appellant requested the opportunity to check the rule regarding his right, which the trial judge allowed. (RR 26: 9). The record reflects defense counsel conferred, proffered no further argument or objection, and then proceeded to question Dr. Mauro about the basis for her findings. (RR 26: 10). After briefly questioning Dr. Mauro, appellant stated he had no objection to her testimony. (RR 26: 11).

**Appellant Failed to Preserve Any Alleged Error for Review**

Appellant initially requested a hearing outside the jury's presence on Dr. Mauro's qualifications, and the trial judge granted him that hearing. (RR 26: 6). When appellant asked Dr. Mauro about her specific findings, the trial judge interjected that the purpose of the hearing was to examine Dr. Mauro's qualifications. (RR 26: 8). Appellant agreed. (RR 26: 9). But, appellant contended he had "the right to question whether there is a scientific basis to her

62

findings prior to her testifying about those findings."[27] (RR 26: 9). The trial judge agreed that appellant could ask Dr. Mauro about the basis of her findings but without going into her specific findings. (RR 26: 9). Appellant requested to check the rule, which the trial judge allowed. (RR 26: 9). Appellant proceeded with the hearing without any further objection or request to query Dr. Mauro on her specific findings. There being no adverse rulings, appellant failed to present any alleged error for review. Tex.R.App.Proc. 33.1(a); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex.Crim.App. 2008), *cert.denied*, 555 U.S. 1105 (2009). Moreover, appellant had no objection to Dr. Mauro's testimony at trial. Therefore, no alleged error is preserved for review. Tex.R.App.Proc. 33.1. Appellant's third point of error should be overruled on procedural default grounds.

**The Trial Judge Afforded Appellant a Proper Rule 705(b) Hearing**

Texas Rule of Evidence 705(b) provides:

> **Voir Dire.** Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall, or in a civil case may, be permitted to conduct a *voir dire* examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.

Under this rule, a defendant is entitled upon a timely request to conduct a voir dire examination directed to the underlying facts or data upon which the opinion of an

---

[27] A request to take a witness on voir dire to prove up her expert qualifications does not constitute a request for a Rule 705(b) hearing to inquire into the "underlying facts or data" of the expert's opinion. *Jenkins v. State*, 912 S.W.2d 793, 814 (Tex.Crim.App. 1995) (op. on reh'g.).

expert witness is based. *Alba v. State*, 905 S.W.2d 581, 587 (Tex.Crim.App. 1995), *cert.denied*, 516 U.S. 1077 (1996). The trial court must allow this examination to be conducted outside the hearing of the jury and prior to the expert testifying to her opinion before the jury. *Id.* at 587-88. The purpose of Rule 705(b) is to give defense counsel the "opportunity to determine the foundation of the expert's opinion without fear of eliciting damaging hearsay or other inadmissible evidence in the jury's presence." *Id.* at 588, citing *Goss v. State*, 826 S.W.2d 162, 168 (Tex.Crim.App. 1992), *cert.denied*, 113 S.Ct. 3035 (1993).

Appellant contends the trial court erred in not allowing him to question Dr. Mauro about her specific findings in the voir dire hearing on her qualifications. By its express terms, Rule 705(b) does not authorize inquiry into the expert's specific findings. It allows inquiry into the underlying basis of the expert's opinion, which the trial judge allowed in this case. The record reflects that the trial judge complied with the requisites of Rule 705(b), and appellant fails to show any alleged error.

Appellant's third point of error is wholly without merit and should be overruled.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays this Court to overrule the appellant's points of error and to affirm the trial court's judgment.

Respectfully submitted,

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
(512) 854-9400
Fax No. 854-4810

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2)(A), the State certifies that the length of this brief is 14,078 words.  The State also certifies, pursuant to Texas Rule of Appellate Procedure 9.4(e), a conventional typeface 14-point was used to generate this brief.

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney

65

**CERTIFICATE OF SERVICE**

This is to certify that the above State's brief was sent, via U.S. mail, email, facsimile, or electronically through the electronic filing manager, to the appellant's attorney on appeal, Ariel Payan, Attorney at Law, 1012 Rio Grande, Austin, Texas 78701; Honorable Lisa C. McMinn, State Prosecuting Attorney, P.O. Box 13046, Austin, Texas 78711; and appellant's writ of habeas corpus attorney, Brad Levenson, Office of Capital Writs, 1033 La Posada Drive, Suite 374, Austin, Texas 78752-3824, on this 20th day of July, 2015.

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney